# MONROE *v.* STANDARD OIL CO.

No. 80–298.  Argued March 4, 1981—Decided June 17, 1981

STEWART, J., delivered the opinion of the Court, in which WHITE, MARSHALL, REHNQUIST, and STEVENS, JJ., joined. BURGER, C. J., filed a dissenting opinion, in which BRENNAN, BLACKMUN, and POWELL, JJ., joined, *post*, p. 566.

*Alan I. Horowitz* argued the cause for petitioner. With him on the briefs were *Solicitor General McCree, Assistant Attorney General Daniel, Robert E. Kopp, Beate Bloch, Lois G. Williams, Kerry L. Adams,* and *William Taylor.*

*Paul S. McAuliffe* argued the cause and filed a brief for respondent.*

JUSTICE STEWART delivered the opinion of the Court.

The Court of Appeals for the Sixth Circuit concluded that 38 U. S. C. § 2021 (b)(3), a provision of the Vietnam Era Veterans' Readjustment Assistance Act of 1974, does not require an employer to provide preferential scheduling of work hours for an employee who must be absent from work to fulfill his military reserve obligations. 613 F. 2d 641. We granted certiorari to consider the petitioner's contention that an employer has a statutory duty to make work-scheduling accommodations for reservist-employees not made for other employees, whenever such accommodations reasonably can be accomplished. 449 U. S. 949.[1]

## I

In 1975 and 1976, the years pertinent to this litigation, the petitioner was a full-time employee in the respondent's continuous process refinery in Lima, Ohio. The refinery was operated 24 hours a day, 7 days a week, 365 days a year. To insure that the burdens of weekend and shift work would be equitably divided among its employees over the course of a year, the respondent scheduled its employees to work five 8-hour days in a row weekly, but in a different 5-day sequence each week. Under the respondent's collective agreement with its union, however, an employee could, with the acquiescence of his foreman and if the change did not require the payment of overtime, exchange shifts with another employee.

During the same period, the petitioner was a military re-

---

*Martin J. Klaper* and *David L. Gray* filed a brief for Cummins Engine Co., Inc., as *amicus curiae* urging affirmance.

[1] There is an apparent intercircuit conflict on this issue. Compare the case under review with *West* v. *Safeway Stores, Inc.*, 609 F. 2d 147 (CA5).

servist,[2] and had to attend training with his unit one weekend a month and for two weeks each summer. On a number of weekends, the petitioner was required to attend training on days when he was scheduled to work at the refinery. Although the petitioner was able on four of these occasions to exchange shifts with other employees, he was unable to make such an exchange in most instances. The respondent provided him with leaves of absence to attend training, as 38 U. S. C. § 2024 (d)[3] required it to do, but it did not pay him for the hours he did not work, nor did it take steps to permit him to make up those hours by working outside his normal schedule. When the petitioner was on a leave of absence and could not arrange a switch with another employee, the respondent would make arrangements to fill the vacancy created by the petitioner's absence, arrangements often requiring the payment of overtime wages to the substitute.

In 1976, the petitioner[4] brought this action against the respondent alleging that it had violated the provisions of 38 U. S. C. §§ 2021 (b)(3)[5] and 2024 (d). Noting that the

---

[2] In oral argument, counsel for the respondent indicated that the petitioner was a member of the Ohio National Guard. This is not apparent in the record, but both Ready Reservists and National Guardsmen are equally entitled to the protection of 38 U. S. C. § 2021 (b)(3). See S. Rep. No. 1477, 90th Cong., 2d Sess., 1, 5 (1968); H. R. Rep. No. 1303, 90th Cong., 2d Sess., 3, 6 (1968).

[3] Title 38 U. S. C. § 2024 (d) provides in pertinent part:
"Any employee . . . shall upon request be granted a leave of absence by such person's employer for the period required to perform active duty for training or inactive duty for training in the Armed Forces of the United States. Upon such employee's release from a period of such active duty for training or inactive duty for training, . . . such employee shall be permitted to return to such employee's position with such seniority, status, pay, and vacation as such employee would have had if such employee had not been absent for such purposes. . . ."

[4] The Department of Justice represents the petitioner pursuant to 38 U. S. C. § 2022.

[5] Section 2021 (b)(3) provides:
"Any person who holds a position described in clause (A) or (B) of sub-

first of these sections provides that an employer may not deny a military reservist in his employ any "incident or advantage of employment" because of the employee's obligations to the Reserves, and finding that "being scheduled for a full forty hour week at the [respondent's] refinery constitutes an incident or advantage of employment," the District Court for the Northern District of Ohio granted summary judgment to the petitioner. 446 F. Supp. 616, 618, 619. The court awarded petitioner $1,086.72 for wages lost on those "work dates when an accommodation should have been made." *Id.*, at 619.[6]

The Court of Appeals for the Sixth Circuit reversed. 613 F. 2d 641. First, it determined that the respondent had met the requirements of § 2024 (d).[7] It noted that this section "guarantees terms and conditions of reemployment to reservists returning from inactive duty training," but found that "[i]t does not, however, protect reservists from discrimination by their employers between training assignments." *Id.*, at 643–644.

Next, the Court of Appeals rejected the District Court's

---

section (a) of this section shall not be denied retention in employment or any promotion or other incident or advantage of employment because of any obligation as a member of a Reserve component of the Armed Forces."

[6] The petitioner does not urge here that he had to be paid for hours not worked.

[7] There is no dispute that the respondent has complied with all relevant requirements of § 2024 (d). See n. 3, *supra*. This section compels employers to grant leaves of absence to employees who must attend reserve training, and entitles a reservist who has been absent for inactive reserve training to benefits upon his return, such as wage rates and seniority, which automatically would have accrued if he had remained in the continuous service of his employer. See *Aiello* v. *Detroit Free Press, Inc.*, 570 F. 2d 145, 148 (CA6). It does not entitle a reservist to benefits that are conditioned upon work requirements demanding actual performance on the job. See *ibid.* See also *Foster* v. *Dravo Corp.*, 420 U. S. 92. Thus, it is not contended that § 2024 (d) requires employers to pay absent reservists for hours not worked.

interpretation of § 2021 (b)(3). It held that this section "merely requires that reservists be treated equally or neutrally with their fellow employees without military obligations." *Id.,* at 646. The appellate court then concluded that the respondent had taken no discriminatory action that is proscribed by § 2021 (b)(3):

> "The requirement of equal treatment was met in the present case. The parties agreed that appellee was regularly scheduled for forty-hour workweeks, as were his fellow employees. Further, Monroe was scheduled for weekend work in accordance with Sohio's established practice of rotating shifts to insure that all employees would work approximately an equal number of weekend days. Finally, he was treated the same as his coworkers with regard to the right to exchange shifts with other employees." *Id.,* at 646.

## II

This case presents the first occasion this Court has had to address issues arising from the statutory provisions, codified at 38 U. S. C. § 2021 *et seq.,* specifically dealing with military reservists.[8] We have, however, frequently interpreted the somewhat analogous statutory provisions entitling the returning regular veteran to reinstatement with his "seniority, status and pay" intact, 38 U. S. C. § 2021 (a), most recently in *Coffy* v. *Republic Steel Corp.,* 447 U. S. 191, and *Alabama Power Co.* v. *Davis,* 431 U. S. 581.

## A

Statutory re-employment rights for veterans date from the Nation's first peacetime draft law, passed in 1940, which provided that a veteran returning to civilian employment

---

[8] Before their recodification in 1974, the veterans' re-employment rights provisions were codified at 50 U. S. C. App. § 459 (1970 ed.) (§ 9 of the Military Selective Service Act of 1967). See *Coffy* v. *Republic Steel Corp.,* 447 U. S. 191, 194, n. 2.

from active duty was entitled to reinstatement to the position that he had left or one of "like seniority, status, and pay." 38 U. S. C. § 2021 (a). In 1951, in order to strengthen the Nation's Reserve Forces, Congress extended reinstatement rights to employees returning from training duty. See Pub. L. 51, ch. 144, § 1 (s), 65 Stat. 75, 86–87. Thereafter, the Reserve Forces Act of 1955, Pub. L. 305, ch. 665, § 262 (f), 69 Stat. 598, 602, provided that employees returning from active duty of more than three months in the Ready Reserve were entitled to the same employment rights as inductees, with limited exceptions. In 1960, these re-employment rights were extended to National Guardsmen, Pub. L. 86–632, 74 Stat. 467. See 38 U. S. C. § 2024 (c). In addition, a new section, now codified at 38 U. S. C. § 2024 (d), was enacted in 1960 to deal with problems faced by employees who had military training obligations lasting less than three months. This section provides that employees must be granted a leave of absence for training and, upon their return, be restored to their position "with such seniority, status, pay, and vacation" as they would have had if they had not been absent for training.

Section 2024 (d) closely paralleled 38 U. S. C. § 2021 (a), the latter section ensuring the reinstatement of regular veterans returning from active duty.[9] But § 2024 (d) did not

---

[9] Section 2021 (a) provides as follows:

"In the case of any person who is inducted into the Armed Forces of the United States under the Military Selective Service Act [50 U. S. C. App. §§ 451–473] (or under any prior or subsequent corresponding law) for training and service and who leaves a position (other than a temporary position) in the employ of any employer in order to perform such training and service; and (1) receives a certificate described in section 9 (a) of the Military Selective Service Act [50 U. S. C. App. § 459 (a)] (relating to the satisfactory completion of military service), and (2) makes application for reemployment within ninety days after such person is relieved from such training and service or from hospitalization continuing after discharge for a period of not more than one year—

"(A) if such position was in the employ of the United States Gov-

provide reservists with protection against discharges, demotions, or other discriminatory conduct once reinstated. Section 2021 (b)(2), on the other hand, provided regular veterans returning from active duty one year's "protection . . . against certain types of discharges or demotions that might rob the veteran's reemployment of its substance." *Oakley* v. *Louisville & Nashville R. Co.*, 338 U. S. 278, 285. The legislative history of § 2021 (b)(3) indicates that it was designed to provide similar protection to employee-reservists.[10]

ernment, its territories, or possessions, or political subdivisions thereof, or the District of Columbia, such person shall—

"(i) if still qualified to perform the duties of such position, be restored to such position or to a position of like seniority, status, and pay; or

"(ii) if not qualified to perform the duties of such position, by reason of disability sustained during such service, but qualified to perform the duties of any other position in the employ of the employer, be offered employment and, if such person so requests, be employed in such other position the duties of which such person is qualified to perform as will provide such person like seniority, status, and pay, or the nearest approximation thereof consistent with the circumstances in such person's case;

"(B) if such position was in the employ of a State, or political subdivision thereof, or a private employer, such employee shall—

"(i) if still qualified to perform the duties of such position, be restored by such employer or the employer's successor in interest to such position or to a position of like seniority, status, and pay; or

"(ii) [as in (A)(ii), *supra*, except for references to the 'employer's successor in interest']."

[10] The bill that included what became 38 U. S. C. § 2021 (b)(3) was introduced in the 89th Congress. H. R. 11509, 89th Cong., 1st Sess. (1965). Hearings were held before Subcommittee No. 3 of the House Committee on Armed Services in February 1966. Hearings on H. R. 11509 before Subcommittee No. 3 of the House Committee on Armed Services, 89th Cong., 1st Sess. (1966) (hereafter 1966 House Hearings). The bill was favorably reported by the full Committee, H. R. Rep. No. 1303, 89th Cong., 2d Sess. (1966), and was passed by the House on March 7, 1966, 112 Cong. Rec. 5016 (1966). No action, however, was taken on the measure by the Senate in the 89th Congress.

The bill was reintroduced in the 90th Congress. H. R. 1093, 90th Cong., 1st Sess. (1967); S. 2561, 90th Cong., 1st Sess. (1967). Hearings

## B

Section 2021 (b)(3) provides in pertinent part:

"Any person who [is employed by a private employer] shall not be denied retention in employment or any promotion or other incident or advantage of employment because of any obligation as a member of a Reserve component of the Armed Forces."

The Senate Report on the bill that became § 2021 (b)(3), stated that the purpose of the enactment was "to prevent reservists and National Guardsmen not on active duty who must attend weekend drills or summer training from being discriminated against in employment because of their Reserve membership . . . ." S. Rep. No. 1477, 90th Cong., 2d Sess., 1–2 (1968). The Report explained that "[e]mployment practices that discriminate against employees with Reserve obligations have become an increasing problem in recent years. Some of these employees have been denied promotions because they must attend weekly drills or summer training

---

were again held before Subcommittee No. 3 of the House Committee, on March 20, 1968. Hearings on H. R. 1093 before Subcommittee No. 3 of the House Committee on Armed Services, 90th Cong., 1st Sess. (1968) (hereafter 1968 House Hearings). The bill was favorably reported by the full Committee on April 24, 1968, H. R. Rep. No. 1303, 90th Cong., 2d Sess. (1968), and initially passed by the House on May 6, 1968, 114 Cong. Rec. 11779 (1968). Hearings were held by the Senate Committee on Armed Services on July 25, 1968. Hearings on H. R. 1093 before Senate Committee on Armed Services, 90th Cong., 2d Sess. (1968) (hereafter 1968 Senate Hearings). The bill was favorably reported by the Committee, S. Rep. No. 1477, 90th Cong., 2d Sess. (1968), on July 26, 1968, and passed the Senate on July 29, 1968, 114 Cong. Rec. 24017 (1968). The Senate concurred in the House amendment. *Id.*, at 24999. The bill was signed into law on August 17, 1968. Pub. L. 90–491, 82 Stat. 790.

The language of that portion of the bill which became § 2021 (b)(3) was unchanged throughout its legislative consideration. There was no substantive discussion of the measure on the floor of either chamber. Accordingly, the key portions of the legislative history are the three hearings held on the proposed measure and the three Committee Reports.

and others have been discharged because of these obligations. . . . [T]he bill is intended to protect members of the Reserve components of the Armed Forces from such practices." *Id.*, at 2. The protection was to be accomplished by entitling reservists "to the same treatment afforded their coworkers not having such military obligations . . . ." *Ibid.*

The House Report announced the same motivation. The bill was described as providing "job protection for employees with obligations as members of a reserve component." H. R. Rep. No. 1303, 90th Cong., 2d Sess., 3 (1968). The House Report elaborated as follows:

> "Section (1) amplifies existing law to make clear that reservists not on active duty, who have a remaining Reserve obligation, whether acquired voluntarily or involuntarily, will nonetheless not be discriminated against by their employees [*sic*] soley [*sic*] because of such Reserve affiliation.
>
> *"It assures that these reservists will be entitled to the same treatment afforded their coworkers without such military obligation.*
>
> *"The law does not now protect these reservists against discharge without cause, as it does with inductees and enlistees, who have 1-year protection, and initial active duty for training reservists, who have 6 months' protection." Ibid.* (emphasis added).

The legislation was originally proposed by the Department of Labor. Accordingly, the testimony of Hugh W. Bradley, Director of the Office of Veterans' Reemployment Rights of the Labor Department, who was the chief administration spokesman for the provision, is instructive. He described the relevant portions of the legislation to the House Committee on Armed Services:

> "The first provision of the bill deals with a problem that has been increasingly difficult in the past few years. *It is designed to enable reservists and guardsmen who leave*

*their jobs to perform training in the Armed Forces, to retain their employment and to enjoy all of the employment opportunities and benefits accorded their coworkers who do not have military training obligations.* The law does not now protect them against discharge without cause as it does inductees and enlistees, who have 1-year protection, and initial active duty for training reservists, who have 6 months' protection." 1966 House Hearings, at 5312 (emphasis added).

See also 1968 House Hearings, at 7471.

Testimony by Rear Admiral Burton H. Shupper, U. S. N., appearing on behalf of the Department of Defense, also reflected the purposes behind the enactment:

"The other aspect of H. R. 11509 is the provision that employees shall not be denied retention in employment or advantages of employment because of any obligation as a member of a Reserve component of the Armed Forces. *After the Berlin and Cuba callups, we received information from our Reserve community that a significant number of reservists were receiving indications that opportunities for advancement and retention in civilian employment would favor those who appear to offer their employers more continuity of services, namely those in the Standby Reserve or those with no Reserve* status. In fairness, we must emphasize that this reaction on the part of employers appears to be the exception not the rule and, we believe, is generally not based upon unpatriotic motives but rather on the competitive spirit of business." 1966 House Hearings, at 5315.

The legislative history thus indicates that § 2021 (b)(3) was enacted for the significant but limited purpose of protecting the employee-reservist against discriminations like discharge and demotion, motivated solely by reserve status. Congress wished to provide protection to reservists compara-

ble to that already protecting the regular veteran from "discharge without cause"—to insure that employers would not penalize or rid themselves of returning reservists after a mere *pro forma* compliance with § 2024 (d).[11] And the consistent focus of the administration that proposed the statute, and of the Congresses that considered it, was on the need to protect reservists from the temptation of employers to deny them the same treatment afforded their co-workers without military obligations. The petitioner's contention that his employer was obliged to provide work-schedule preferences not available to other employees must be considered against this legislative background.

## C

The petitioner's argument is that the respondent corporation was obligated to make special efforts to schedule his work hours so he would avoid any lost time by reason of his reserve obligations. He does not allege that the respondent singled him out unfairly, or in any other way discriminated

---

[11] This same purpose was reflected in a statement in support of the legislation by Austin E. Kerby, the Director of the National Economic Commission of the American Legion:

"The American Legion feels very strongly that employees with reserve obligations who are members of the National Guard and the Reserves *should not be denied retention in employment or promotional opportunities solely because of their participation in the Reserve Training Program.* They should be afforded all the employment opportunities and benefits as those who do not have training obligations. The Reemployment Rights Statutes do not now protect National Guard members. and Reservists as it does inductees and enlistees, who have one-year protection, and initial active duty for training reservists who have six-months protection.

"H. R. 1093 [H. R. 11509 as reintroduced in the 90th Congress, see n. 10, *supra*] would add a new section, 9 (c)(3), under the reemployment provisions of the Universal Military Training and Service Act which would prevent discharge from employment without cause because of membership in the National Guard or Reserves, and would also prevent discrimination in such areas as promotion, training opportunities and pay increases." 1968 Hearings, at 7477 (emphasis added).

against him vis-à-vis other employees in the scheduling of work. Indeed, the petitioner's argument would require work-assignment preferences not available to any nonreservist employee at the respondent's refinery.

The problem with the petitioner's position is that there is nothing in § 2021 (b)(3) or its legislative history to indicate that Congress ever even considered imposing an obligation on employers to provide a special work-scheduling preference. Indeed, the legislative history, set out above, strongly suggests that Congress did not intend employers to provide special benefits to employee-reservists not generally made available to other employees.[12] Congress, and the administration spokesman for the legislation, stated explicitly that reservists were to be entitled "to the same treatment afforded their co-workers not having such military obligations . . . ." S. Rep. No. 1477, 90th Cong., 2d Sess., 2 (1968); see also H. R. Rep. No. 1303, 89th Cong., 2d Sess., 3 (1966); 1968 House Hearings, at 7471 (testimony of Hugh W. Bradley).

The strongest language culled by the petitioner from the legislative history to support his argument is a single passage in the 1966 House Report on H. R. 11509: "If these young men are essential to our national defense, then certainly our Government and employers have a moral obligation to see that their economic well being is disrupted to the minimum extent possible." H. R. Rep. No. 1303, 89th Cong., 2d Sess., 3 (1966).[13] But this generalized statement appears

---

[12] One could argue, of course, that "protection . . . against certain types of discharges or demotions that might rob the veteran's reemployment of its substance," *Oakley* v. *Louisville & Nashville R. Co.*, 338 U. S. 278, 285 (in reference to § 2021 (b)(2) but equally relevant here) amounts to preferential treatment. But this sort of treatment, clearly intended by the statute and its legislative history, is better understood as protection against discrimination that would not have occurred were it not for reserve obligations, than as preferential treatment accorded solely because of reserve status.

[13] The legislative history is barren of any indication that Congress intended employers to compensate employees for work hours missed while

only in the 1966 House Report; it is not contained in either the House or the Senate Report that accompanied the bill as finally enacted in the 90th Congress. Compare *ibid.* with H. R. Rep. No. 1303, 90th Cong., 2d Sess., 3, 8 (1968), and S. Rep. No. 1477, 90th Cong., 2d Sess., 3 (1968). Moreover, language in the same 1966 House Report specifically indicated that only a nondiscrimination measure was intended: "It should be noted that the only substantive changes in existing law relate to . . . the prohibition against employer discrimination against reservists who participate in the Reserve or National Guard programs." H. R. Rep. No. 1303, 89th Cong., 2d Sess., 4 (1966).

It appears that the origin of the passage the petitioner relies on is a statement by Hugh W. Bradley before the House Committee in 1966. See 1966 House Hearings, at 5313. Yet this passage disappeared from Bradley's presentation to both the House and Senate Committees in the subsequent Congress. See 1968 House Hearings, at 7471, 7472; 1968 Senate Hearings, at 2, 3. And in all three of his congressional appearances, Bradley made it abundantly clear that the purpose of the legislation was to protect employee reservists from discharge, denial of promotional opportunities, or other comparable *adverse* treatment solely by reason of their military obligations; there was never any suggestion of employer responsibility to provide preferential treatment. In any case, the language relied on by the petitioner hardly supports a finding that Congress intended § 2021 (b)(3) to convert a generalized moral obligation into a specific legal duty.

## D

Aside from a lack of support in legislative history, the petitioner's argument suffers other flaws. While the present case

---

fulfilling military reserve obligations, which would of course amount to employee receipt of double compensation for such periods.

involves absences for weekend duty, the statutory language is not so limited; it refers to "any obligation as a member of a Reserve component . . . ." Section 2021 (b)(3) has been applied, for example, to 2-week summer camps, *Carney* v. *Cummins Engine Co.,* 602 F. 2d 763 (CA7); 6-week training sessions, *Carlson* v. *New Hampshire Dept. of Safety,* 609 F. 2d 1025 (CA1); and 2-month training sessions, *Peel* v. *Florida Dept. of Transportation,* 443 F. Supp. 451 (ND Fla.), aff'd, 600 F. 2d 1070 (CA5). Accordingly, there is no principled way of distinguishing between an employer's obligation to make scheduling accommodations for weekends as opposed to, for example, annual 2-week training periods, or even longer periods of training or duty. And certainly there is nothing in the legislative history that would indicate Congress intended that reservists were to be entitled to all "incidents and advantages of employment" accorded during their absence to working employees, including regular time and overtime pay.[14]

The petitioner concedes that it might be impossible, or at least unduly burdensome, to accommodate a reservist's absences for periods as long as the mandatory 2-week summer training session. Perhaps for this reason, he attempts to limit the obvious implications of his theory by arguing that

---

[14] The Veterans' Reemployment Rights Handbook, published by the Office of Veterans' Reemployment Rights in 1970 and still in use today, notes that "[t]he law does not require the employer to pay the employee for the time he is absent for military training duty, or even to make up the difference between his military pay and his regular earnings for that period. In this respect, of course, many employers have adopted voluntary policies or contractual obligations, or are subject to State statutes, which give reservists and guardsmen more than the statute [38 U. S. C. § 2021 *et seq.*] requires." *Id.,* at 113. And in the many examples in the Handbook addressed to typical problems an employer may confront because of employee military obligations, there is not so much as a hint that an employer has an obligation to adjust an employee's work schedule to make up for time lost because of military obligations.

"the statute only requires an employer to take reasonable steps to accommodate the reservists." But, as is true of the petitioner's more general affirmative obligation theory, there is nothing in the statute or its history to support such a notion.

Indeed, a "reasonable accommodation" to employee-reservists because of missed worktime has already been made by Congress in § 2024 (d). There, Congress decided what allowance employers should make to reservists whose duties force them to miss time at work: provide them a leave of absence. If Congress had wanted to impose an additional obligation upon employers, guaranteeing that employee-reservists have the opportunity to work the same number of hours, or earn the same amount of pay that they would have earned without absences attributable to military reserve duties, it could have done so expressly.[15] By contrast, there is no evidence that the Congress that enacted § 2021 (b)(3) showed any concern with the problem of missed work hours, let alone imposed any duty to "take reasonable steps to accommodate the reservists" in this or any other respect.

The petitioner makes no suggestion why his theory of "reasonable accommodation" should apply only to "incidents or advantages of employment," and not to the other provisions of § 2021 (b)(3): retention and promotion. Presumably, if it applies to one provision of the section, it should apply to them all. But if an employer could, for example, defend a

---

[15] Section 403 of the Vietnam Era Veterans' Readjustment Assistance Act of 1974, Pub. L. 93–508, 88 Stat. 1594, for example, made specific revisions to the existing provisions of the veterans' re-employment rights laws that impose explicit obligations upon employers with respect to certain disabled veterans of the Vietnam era. 38 U. S. C. § 2012. See S. Conf. Rep. No. 93–1107, p. 34 (1974). See also S. Conf. Rep. No. 93–1240, p. 34 (1974); H. R. Conf. Rep. No. 93–1303, p. 34 (1974); H. R. Conf. Rep. No. 93–1435, p. 35 (1974). Cf. *Southeastern Community College* v. *Davis,* 442 U. S. 397, 410–411.

denial of promotion to an employee-reservist because the promotion could not be "reasonably accommodated," the protection afforded by § 2021 (b)(3) would clearly be reduced, if not altogether eliminated.

Finally, the petitioner suggests that § 2021 (b)(3) must have the meaning he attributes to it, because the section would otherwise be of little significance. But the nondiscrimination requirements of the section impose substantial obligations upon employers. The frequent absences from work of an employee-reservist may affect productivity and cause considerable inconvenience to an employer who must find alternative means to get necessary work done. Yet Congress has provided in § 2021 (b)(3) that employers may not rid themselves of such inconveniences and productivity losses by discharging or otherwise disadvantaging employee-reservists solely because of their military obligations.

## III

This Court does not sit to draw the most appropriate balance between benefits to employee-reservists and costs to employers. That is the responsibility of Congress. If Congress desires to amend § 2021 (b)(3) to require special work-hour scheduling for military reservists where it is reasonably possible, it is free to do so. But we must deal with the law as it is.

The respondent did not deny the petitioner anything that he would have received had he not been a reservist. He was scheduled for 40 hours work a week, as all other employees in the refinery were.[16] He was assigned the same burden of weekend and shift work as were his fellow employees. And he was allowed to exchange shifts in the man-

---

[16] We note that the collective agreement between the respondent and the petitioner's union stated that it "defines the normal hours of work and shall not be construed as a guarantee of hours of work per day or per week or of days of work per week."

ner accepted by his union and the respondent, just as all other employees were.[17]   Accordingly, the judgment of the Court of Appeals is affirmed.

*It is so ordered.*

CHIEF JUSTICE BURGER, with whom JUSTICE BRENNAN, JUSTICE BLACKMUN, and JUSTICE POWELL join, dissenting.

The Court today unduly restricts the employment protections accorded Ready Reservists and National Guardsmen by Congress.   In my view, the Court's decision is based upon an erroneous interpretation of 38 U. S. C. § 2021 (b)(3) and, in effect, allows employees to be penalized for their service in the military contrary to congressional intent.

# I

## A

As in any case involving statutory construction, "our starting point must be the language employed by Congress." *Reiter* v. *Sonotone Corp.,* 442 U. S. 330, 337 (1979).   Title 38 U. S. C. § 2021 (a) requires that a veteran returning to civilian employment after military duty be restored to the position he previously held or to "a position of like seniority, status, and pay."   In addition, 38 U. S. C. § 2021 (b)(1) provides that the veteran's reinstatement must be "without loss of seniority" and that he "shall not be discharged from such position without cause within one year after such restoration or reemployment."   See *Oakley* v. *Louisville & Nashville R. Co.,* 338 U. S. 278, 284–285 (1949).   Similar safeguards are granted in 38 U. S. C. § 2024 (c) to members of "a Reserve component of the Armed Forces" who have military obligations lasting more than three months.   As to reservists whose

---

[17] Of course, nothing in this opinion *prevents* an employer from providing special scheduling accommodation to employee-reservists.   See n. 14, *supra.*

commitments are less than three months, 38 U. S. C. § 2024 (d) provides in pertinent part:

> "Any employee . . . shall upon request be granted a leave of absence by such person's employer for the period required to perform active duty for training or inactive duty training in the Armed Forces of the United States. Upon such employee's release from a period of such active duty for training or inactive duty training, or upon such employee's discharge from hospitalization incident to that training, such employee shall be permitted to return to such employee's position with such seniority, status, pay, and vacation as such employee would have had if such employee had not been absent for such purposes."

Additional guarantees for reservists are contained in 38 U. S. C. § 2021 (b)(3), on which petitioner bases his claim for nonconflicting work hours. Section 2021 (b)(3) states:

> "Any person who [is employed by the Federal Government, a state government, or a private employer] *shall not be denied retention in employment or any promotion or other incident or advantage of employment* because of any obligation as a member of a Reserve component of the Armed Forces." (Emphasis added.)

The Court concludes that "§ 2021 (b)(3) was enacted for the . . . limited purpose of protecting the employee-reservist against discriminations like discharge and demotion, motivated solely by reserve status." *Ante,* at 559. Yet the plain language of the statute belies such a narrow interpretation. Although § 2021 (b)(3) proscribes the termination of a reservist because of his military obligations, it also expressly prohibits the denial of "any promotion or other incident or advantage of employment." Such protection is clearly broader than that enjoyed by returning veterans under § 2021 (b)(1), but is understandable because the reservist has continuing

military commitments requiring his absence that may disadvantage him in his employment.

## B

Just as the language of § 2021 (b)(3) does not demonstrate a congressional intent to confine the statute's application to "discriminations like discharge and demotion," neither does the legislative history. When the bill, H. R. 11509, 89th Cong., 1st Sess. (1965), that included what eventually became 38 U. S. C. § 2021 (b)(3) was first introduced, Subcommittee No. 3 of the House Committee on Armed Services held hearings and the full Committee thereafter reported favorably on the bill. The Committee's Report, which reflected the hearing testimony of Hugh W. Bradley, Director of the Office of Veterans' Reemployment Rights of the Department of Labor, stated:

"Employment practices which disadvantage employees with Reserve obligations have become an increasing problem in recent years. Paragraph 1 of the bill will protect members of the Reserve components of the Armed Forces, including the National Guard, from such practices. It is designed to enable reservists and guardsmen who leave their jobs to perform training in the Armed Forces *to retain their employment and to enjoy all of the employment opportunities and benefits accorded their coworkers who do not . . . have a Reserve obligation.*

"It assures that these reservists will be entitled to the same treatment afforded their coworkers without such military obligations . . . .

"The law does not now protect these reservists against discharge without cause as it does with inductees and enlistees, who have 1-year protection, and initial active duty for training reservists, who have 6 months' protection.

"To give the reservist a specific period of protection after each tour of training duty would be to perpetuate

him in his position indefinitely. The new section . . . would not follow this approach but instead provides that an employee shall not be denied retention in his employment or any promotion or other incident or advantage of employment solely because of any obligation as a member of a Reserve component of the Armed Forces.

.            .            .            .            .

"If these young men are essential to our national defense, then certainly our Government and employers have a moral obligation to see that their economic well being is disrupted to the minimum extent possible." H. R. Rep. No. 1303, 89th Cong., 2d Sess., 3 (1966) (emphasis added).

Although the bill was passed by the House, 112 Cong. Rec. 5017 (1966), the Senate took no action on the measure during the 89th Congress.

The bill was reintroduced in the 90th Congress. H. R. 1093, 90th Cong., 1st Sess. (1967); S. 2561, 90th Cong., 1st Sess. (1967). Hearings again were held before Subcommittee No. 3 of the House Committee on Armed Services, at which a statement expressing the view of the American Legion was entered on the record:

"The American Legion feels very strongly that employees with reserve obligations who are members of the National Guard and the Reserves . . . should be afforded *all the employment opportunities and benefits as those who do not have training obligations. . . .*

"[The new section] would prevent discharge from employment without cause because of membership in the National Guard or Reserves, *and would also prevent discrimination in such areas as promotion, training opportunities and pay increases."* Hearings on H. R. 1093 before Subcommittee No. 3 of the House Committee on Armed Services, 90th Cong., 1st Sess., 7477 (1968) (emphasis added).

Noting that protection of "reservists and guardsmen from being disadvantaged in employment because of their military obligations" was one of the purposes of the bill, the full Committee's favorable Report explained that "[s]ection (1) *amplifies* existing law to make clear that reservists not on active duty, who have a remaining Reserve obligation, whether acquired voluntarily or involuntarily, will nonetheless not be discriminated against by their employees [*sic*] soley [*sic*] because of such Reserve affiliation." H. R. Rep. No. 1303, 90th Cong., 2d Sess., 3 (1968) (emphasis added).

Following passage of the bill by the House, 114 Cong. Rec. 11779 (1968), the Senate Committee on Armed Services held hearings and issued a Report recommending enactment. The Report repeated the themes which run through every congressional expression on the statutory proposal:

> "This bill is intended . . . to prevent reservists and National Guardsmen not on active duty who must attend weekly drills or summer training from being discriminated against in employment because of their Reserve membership . . . .
>
> . . . . .
>
> "Employment practices that discriminate against employees with Reserve obligations have become an increasing problem in recent years. Some of these employees have been denied promotions because they must attend weekly drills or summer training and others have been discharged because of these obligations. Section 1 of the bill is intended to protect members of the Reserve components of the Armed Forces from such practices. It provides that these reservists will be entitled to the same treatment afforded their coworkers not having such military obligations by requiring that employees with Reserve obligations 'shall not be denied retention in employment or other incident or advantage of employment because of any obligation as a member of a Reserve

component of the Armed Forces of the United States.'"
S. Rep. No. 1477, 90th Cong., 2d Sess., 1–2 (1968).

The bill passed the Senate, 114 Cong. Rec. 24017 (1968), and became law on August 17, 1968. Pub. L. 90–491, 82 Stat. 790.

The legislative history of § 2021 (b)(3) admittedly reveals an intent to protect reservists from discharge because of their short-term absences, just as §§ 2021 (b)(1) and 2024 (c) safeguard returning veterans and reservists who are absent for more than three months. Yet the legislative history also indicates a more expansive congressional purpose of ensuring that reservists are not deprived of *any* employment benefit solely because of their willingness to serve their country.

## II

The benefit at issue here is the opportunity to work a full 40-hour week. Both the District Court and the Court of Appeals concluded that being scheduled to work 40 hours per week is an "incident or advantage" of employment established by the custom and practice at respondent's refinery. 446 F. Supp. 616, 619 (ND Ohio 1978); 613 F. 2d 641, 645 (CA6 1980). Petitioner was treated no different from other employees in terms of work scheduling, and he was given the right to exchange shifts with willing fellow employees pursuant to the collective-bargaining agreement. Nevertheless, during those weeks when his scheduled work hours conflicted with his military commitments and he was unable to arrange an exchange of shifts, the opportunity granted him to work a full 40 hours was illusory since respondent "took no steps to provide [him] with substituted hours." App. 26. Thus, petitioner asserts that respondent violated 38 U. S. C. § 2021 (b)(3) by refusing to rearrange his work schedule to allow him to work 40 hours during those weeks when his military obligations otherwise precluded him from doing so. I agree.

The Court inaccurately characterizes petitioner's claim as seeking "work-schedule preferences not available to other em-

ployees." *Ante,* at 560. Respondent's policy is not to re-adjust the work schedule to accommodate absences for personal reasons, and petitioner alleges no right to special consideration regarding absences unrelated to military service. But if petitioner is to be placed on an equal footing with his co-workers, his military absences cannot be treated simply as personal leaves of absence. See *Carlson* v. *New Hampshire Dept. of Safety,* 609 F. 2d 1024, 1027 (CA1 1979), cert. denied, 446 U. S. 913 (1980); *Lott* v. *Goodyear Aerospace Corp.,* 395 F. Supp. 866, 869–870 (ND Ohio 1975). A reservist's ab-sences for training result from obligations vital to our national defense that other employees have not assumed, and the primary purpose of the re-employment rights statutes is to protect reservists against disadvantages in employment caused by these obligations. Indeed, the essence of the statutory guarantees provided by Congress is that employers must give special treatment to the military absences of veterans and reservists.

The Court emphasizes that "respondent did not deny the petitioner anything that he would have received had he not been a reservist" since he was scheduled for 40 hours of work per week, was assigned the same burden of weekend and shift work as other employees, and was allowed to exchange shifts. *Ante,* at 565. In substance, the Court embraces the Court of Appeals' holding that § 2021 (b)(3) "merely requires that reservists be treated equally or neutrally with their fellow employees without military obligations." 613 F. 2d, at 646. However, unless the statute is read as safeguarding reservists from the adverse effects of facially neutral rules, much of its practical significance is lost. As the United States Court of Appeals for the Fifth Circuit observed in *West* v. *Safeway Stores, Inc.,* 609 F. 2d 147, 149 (1980): "The essence of reserve duty in this context is absence from work. If em-ployers could . . . require that workers be present in order to receive certain benefits, then reservists could never secure the benefits or advantages of employment which the Act was

designed to protect." See also *Carney* v. *Cummins Engine Co.*, 602 F. 2d 763 (CA7 1979), cert. denied, 444 U. S. 1073 (1980).

Petitioner is not attempting to gain an advantage over his co-workers as a result of his reserve membership. He does not assert a right to be paid for hours he does not work, but asks only that he be given the same meaningful chance as other employees without military commitments to work full time in order to earn a living wage. Moreover, the record contains no evidence that it would be unduly burdensome for respondent, if given adequate notice, to accommodate petitioner's weekend military commitments in scheduling his work hours. In fact, counsel for respondent acknowledged at oral argument that petitioner "could be scheduled with the number of . . . Saturdays and Sundays off to accommodate his reserve obligation, without requiring any other employee in the plant to work any more Saturdays and Sundays than they now have to work under the regular routine." Tr. of Oral Arg. 27. See also App. 41–43 (proposed revision of work schedule).

The Court states that one of the flaws in petitioner's argument is that "there is no principled way of distinguishing between an employer's obligation to make scheduling accommodations for weekends as opposed to, for example, annual 2-week training periods, or even longer periods of training or duty." *Ante*, at 563. However, petitioner does not claim a right to make up hours, only to work full time during those weeks when he is available to work 40 hours apart from his reserve duties. Far from asking respondent to do the impossible, petitioner contends only that "reasonable steps" must be taken to accommodate him. Brief for Petitioner 24. Yet it is undisputed that respondent made *no* effort to do so. See App. 26. Cf. *Trans World Airlines, Inc.* v. *Hardison*, 432 U. S. 63 (1977). I cannot accept the Court's conclusion that such total indifference is in keeping with the underlying purposes and express guarantees of § 2021 (b)(3).

The Court's suggestion that respondent need go no further than the requirements of 38 U. S. C. § 2024 (d) in accommodating petitioner—*i. e.*, he must simply be provided "a leave of absence," *ante,* at 564—ignores the separate, broader protections of § 2021 (b)(3), which was enacted because § 2024 (d) was found to be inadequate. In the Court's view, "[i]f Congress had wanted to impose an additional obligation upon employers, guaranteeing that employee-reservists have the opportunity to work the same number of hours, or earn the same amount of pay that they would have earned without absences attributable to military reserve duties, it could have done so expressly." *Ante,* at 564. But it was respondent that conferred on its employees the benefit of 40 hours of work per week, and Congress has provided unequivocally that such a benefit cannot be refused a reservist, as it was here, solely because of his military commitments. The plain language of § 2021 (b)(3) does not differentiate among employment benefits, but "makes it . . . explicit that a reservist or guardsman cannot be . . . denied *any* promotion or other employment benefit or advantage, because of any obligation arising out of his membership in the reserves [or Guard], or because of his absences from work that result from such obligation." U. S. Dept. of Labor, Office of Veterans' Reemployment Rights, Veterans' Reemployment Rights Handbook 114–115 (1970) (emphasis added).

## III

We have held that the re-employment rights statutes are "to be liberally construed for the benefit of those who . . . serve their country." *Fishgold* v. *Sullivan Drydock & Repair Corp.,* 328 U. S. 275, 285 (1946). Accord, *Coffy* v. *Republic Steel Corp.,* 447 U. S. 191, 196 (1980); *Alabama Power Co.* v. *Davis,* 431 U. S. 581, 584 (1977). It is unfortunate, I think, that the Court's decision today undermines that sound principle. The clear purpose of Congress in enacting § 2021 (b)(3) was to expand employment safeguards for reservists and thereby en-

courage participation in the Ready Reserves and the National Guard so as to strengthen our national defense effort without increased reliance on active duty personnel through mandatory military service. Yet that aim is severely frustrated if employers can deprive reservists of "an incident or advantage of employment" as important as the opportunity for full-time work undiminished by weekend absences for military training. Congress surely did not intend that petitioner be put to the choice of quitting the Reserves or forgoing the chance to earn the same wages as other employees who do not have military obligations. Section 2021 (b)(3) was enacted to prevent the very type of disadvantage that petitioner has suffered. Accordingly, I would reverse the judgment of the Court of Appeals.