Jerome C. Kettleson, Asst. U.S. Atty., Bismarck, N.D., for plaintiff.

Gerald A. Kuhn, Napoleon, N.D., for defendant.

**Rosie M. WEBER, Plaintiff,**

v.

**LOGAN COUNTY HOME FOR THE AGED, a corporation, Defendant.**

**Civ. No. A1–82–37.**

United States District Court,
D. North Dakota,
Southwestern Division.

Sept. 13, 1985.

## MEMORANDUM AND ORDER

VAN SICKLE, Senior District Judge.

### INTRODUCTION

The Plaintiff, Rosie M. Weber, brought this suit against the Defendant, Logan County Home for the Aged, under provisions of the Vietnam Era Veterans' Readjustment Act of 1974 (Act), 38 U.S.C. § 2021, et. seq. Plaintiff alleges that Defendant, her former employer, discharged her because of her membership in the National Guard in violation of the Act. Defendant claims that it discharged Plaintiff for good cause unrelated to her National Guard membership. Plaintiff seeks compensatory damages in the form of back pay and prejudgment interest. This Court has jurisdiction pursuant to section 2022 of the Act. The case was tried before the Court without a jury. The sole issue in this case

is whether Plaintiff was discharged by Defendant because of her membership in the National Guard.

FACTS

Weber is forty-five years of age, is a licensed practical nurse, is married to a music teacher, and has elected to subordinate her professional life to his. While her husband taught in Strasburg, North Dakota (a town of 650 population), she worked in the Strasburg Retirement Home, an eighty-three bed facility offering minimal, intermediate, and extensive care, where she served for about thirteen years with approval and without difficulty.

After thirteen years in Strasburg, the Weber family moved to Napoleon, North Dakota (a town of 1,100 population), where Weber's husband had found a better job. Weber became employed by the Logan County Home for the Aged (Home) in Napoleon, a facility of forty-four beds, offering intermediate and minimal care only. She worked at the Home from 1977 to March 18, 1981, when she was discharged from her employment.

In 1974, she entered the United States Army Reserve and was appointed, with a private first class rank, to the Evacuation Hospital, Bismarck, North Dakota, as a ward master. February 14, 1980, she transferred into the National Guard with the rank of staff sergeant. She is now a first sergeant in the National Guard. Her training duties require one weekend every month and two full weeks of summer camp. In Strasburg and Napoleon she was able to meet those requirements on her weekends off and to make arrangements among the staff to cover her summer camp duty.

The Home experienced personnel difficulties and lost its director of nurses, who resigned, on September 20, 1980. On October 7, 1980, although she did not want the responsibility of supervising the other nurses and knew that as a licensed practical nurse she was not qualified under state and federal standards, Weber, after urging by the Home's Board of Directors (Board), took the job of director of nurses

on a temporary basis. The understanding was that when a registered nurse was available to be director of nurses, Weber would revert to her previous position as a licensed practical nurse with ward duties.

February 26, 1981, Don Kleppe became acting administrator of the Home. March 18, 1981, Weber was discharged by Kleppe.

Weber had known who Kleppe was since 1976. She had no social or business contacts with him. He farmed with his father, had previously owned a bar in Napoleon, and had a bachelor's degree in social science.

On August 21, 1980, after attending the monthly training session in Bismarck, Kathy Brunner (DeWald), another member of the National Guard, and Weber drove home from Bismarck to Napoleon, and, wearing their military fatigues, went into the Korner Bar to buy a package of cigarettes and a glass of beer. Kleppe was at the bar, as were John Englehardt, the bartender, and Randy Hall, who taught school with Weber's husband and was a friend of Kleppe's. Kleppe admittedly was drunk. Englehardt teased the women about their apparel and they explained that they were in the "military." Kleppe told them that "no decent woman would be in the military." He then stated that women in the military were "whores, sluts, prostitutes, and lesbians." He also told them that they were not fit to live in Napoleon. The women responded that they were proud to be in the military and one didn't have to be a "loose woman" to be in the military.

Kleppe then told Kathy Brunner (DeWald) he would pay her $25.00 to go with him to the farm to check his father's cattle. She told him to "go to hell." He then told her if she was scared, he would pay $50.00 for both of them to go with him, adding, "I'm man enough to handle you both." Then, apparently realizing he had gone too far, be bought them both a second glass of beer. The two women shoved the drinks back at him and left.

Because of dissension among the staff, the Board discharged one Ellen Johnson as

administrator about November, 1980. This discharge was precipitated because, after an investigation, the Social Service Board notified the Board that the Home would lose its license unless the problem of employee dissension was resolved. After Ellen Johnson's discharge and before Weber's discharge, the state's examiners informed the Board that the situation in the Home had improved but further improvement was necessary.

During this time, Mike Schumacher, a farmer near Napoleon who had previously served on the Board, was reelected to the Board. It was he who persuaded Kleppe to apply for the position of administrator. He also conferred with Kleppe regarding administration problems, including the problem of employee dissension. In these conversations Schumacher told Kleppe that someone might have to be terminated, and it would be Kleppe's job to find out whom.

The Home had no procedure for notice or disclosure of the reasons for discharge. While the Board had not expressly addressed the matter, it is clear that the Board members felt that the administrator had the duty and authority to hire and fire.

Kleppe became the administrator February 21, 1981. On March 17, 1981, Kleppe stopped at the nurses station where Weber and another nurse were working. Kleppe asked if Weber was still in the military, Weber said "yes." Kleppe asked "when are you leaving?" Weber said "April 1st." Kleppe said "no, for the longer period." Weber said "that is in the summer ..." Kleppe then left the nurses station.

About 7:30 a.m. the next morning, March 18, 1981, Kleppe called Weber into his office and told her to close the door. He then told her she was fired and free to go home. Weber asked for a reason and was told "I don't have to give any fuckin' reason." Weber left. Later the same day, the Board called a special meeting to discuss Kleppe's decision. Weber attended part of that meeting. At another special meeting on March 23, 1981, the Board decided to support Kleppe despite his refusal to disclose to the Board the factual basis for his deci-

sion (he claimed he had a duty to his informants to protect their anonymity).

The Home presented evidence to show that Weber was a source of personnel problems at the Home. Various employees testified and accused her of taking all the credit for successful group employee ventures, of fermenting strife by carrying tales to the administrator, of reading novels while on duty, of playing favorites in job assignments, of falsifying her hours worked on her timecards, of garnering excess wages by taking most of the after-hours calls (each after-hours call netted a $5.00 fee to the nurse who responded), and of being heavy-handed with patients.

Although evidence of misconduct on the part of Weber was presented at trial, it is undisputed that she was a nurse with approximately seventeen years experience working in nursing homes, that she recently had been asked by the Board to serve as director of nurses, which she agreed to do on a temporary basis, and that she was told by the Board only eight days before she was fired that when the new director of nurses was hired she would return to her previous position with a raise above her previous salary. (Exhibit 5.)

Furthermore, it is undisputed that Weber had an unblemished personnel record, that the administrators and the Board knew of complaints but took no action as to those complaints, and that neither a Board member nor an administrator ever informed Weber of any problems.

Weber's wage scale as a practical nurse was $4.50 per hour, for 50 weeks of each year (two weeks in National Guard camp). When Weber had completed her duties as temporary director of nurses and returned to her former position she was entitled to a raise of $0.30 per hour at her previous position. (Exhibit 5.) The Home granted its employees the following raises: 1) January 1, 1982, $0.20 per hour; 2) January 1, 1983, $0.25 per hour; 3) January 1, 1984, $0.15 per hour; and 4) January 1, 1985, $0.10 per hour. (Exhibit 7.)

Following her discharge from employment with the Home, Weber earned, in part as an on-call steel building assembler:

1981    $1,695.00
1982    $1,062.00
1983    $1,205.00
1984    $1,550.00
1985    (no figure given)

Weber has abandoned her demand for reinstatement. She has not been employed as a licensed practical nurse since her discharge from the Home, although she has pursued that employment.

DISCUSSION

From the facts recited above, this Court concludes: Weber's difficulties, once they had been investigated, could have been handled by adequate administrative leadership. Probably some discipline was in order. Possibly the problems could have justified discharge after less extreme remedies had been attempted. The Court finds, however, that Weber's misconduct was not a factor in the decision to discharge her. The Court finds the claim that Weber was fired because of her misconduct to be a mere pretext. This Court concludes that the actual cause for the discharge was not any misconduct on Weber's part but Kleppe's animosity toward her because of her service in the National Guard.

Kleppe gave no rational justification for the discharge to Weber or the Board. As to the complaints which surfaced against Weber at trial, Kleppe admitted that he did not investigate the basis for any of the charges against Weber before he discharged her. In fact, he investigated *none* of the charges until the litigation began. Also, on cross-examination Kleppe described Weber as a "superior" director of nurses. And in his June 28, 1983, deposition Kleppe admitted that Weber was not a discipline problem. (Exhibit 20.) Kleppe inquired about her military service obligation within twenty-four hours of the discharge. When he discharged her he gave no reason, but instead reverted to the boorish language pattern he had used when he accosted her in the Korner Bar. He gave no reason even though the discharge was contrary to the position the Board had taken eight days earlier at its regular meeting. (Exhibit 5.)

Section 2021(b)(3) of the Act provides in part that an employee shall not be denied retention in employment because of any obligation as a member of a reserve component of the armed forces. 38 U.S.C. § 2021(b)(3)(1976).

Members of the National Guard are members of the armed forces within the meaning of section 2021. *Monroe v. Standard Oil Co.,* 452 U.S. 549, 552 n. 2, 101 S.Ct. 2510, 2512 n. 2, 69 L.Ed.2d 226 (1981).

The purpose of 38 U.S.C. § 2021(b)(3) was "'to prevent reservists and National Guardsmen not on active duty who must attend weekend drills or summer training from being discriminated against in employment because of their Reserve membership ....' S.Rep. No. 1477, 90th Cong., 2d Sess. 1–2 (1968)." *Id.* at 557, 101 S.Ct. at 2515.

While the statute is to be liberally construed for the benefit of reservists and guardsmen, *see Coffy v. Republic Steel Corp.,* 447 U.S. 191, 196, 100 S.Ct. 2100, 2104, 65 L.Ed.2d 53 (1980); *Dyer v. Hinky Dinky, Inc.,* 710 F.2d 1348, 1350 (8th Cir. 1983), the Supreme Court has held that the Act only protects members of the Armed Forces from discharge motivated solely by their military obligations. *Monroe,* 452 U.S. at 559, 101 S.Ct. at 2516.

■ The Act, then, was designed to protect members of the National Guard from discharge other than for good cause unrelated to their Guard membership. *See id.* at 560, 101 S.Ct. at 2516. Once the employee has presented evidence that the discharge was due to his or her membership in the military, the burden shifts to the employer to prove that the employee was discharged for good cause. *Chesna v. International Fueling Co.,* 753 F.2d 1067 (1st Cir.1984) 115 L.R.R.M.(BNA) 3465, 3466 (D.Mass.1983), *aff'd,* 117 L.R.R.M.(BNA) 2912 (1st Cir.1984); *Henry v. Anderson County, Tennessee Office of the Sheriff,* 522 F.Supp. 1112, 1114 (E.D.Tenn.

1981). *See also Subcomm. No. 3 Consideration of H.R. 11509, To Amend and Clarify the Reemployment Provisions of the Universal Military Training and Service Act, and for Other Purposes: Hearings on H.R. 11509 Before Subcomm. No. 3 of the House Comm. on Armed Services,* 89th Cong., 1st Sess. 5320 (statement of Hugh W. Bradley, Chief of the Bureau of Reemployment Rights, Department of Labor) (the statute would place the burden on the employer to show that the reservist was discharged for cause).

█ This Court finds that Weber was discharged without cause and solely because of her National Guard affiliation in violation of 38 U.S.C. § 2021(b)(3).[1]

Having established that she was discharged in violation of the Act, Plaintiff is entitled to back pay from the date of discharge. *See* 38 U.S.C. § 2022 (1976). Allowable damages must be adequate to compensate Plaintiff fully for her economic losses as a result of Defendant's unlawful acts. *See Hembree v. Georgia Power Co.,* 637 F.2d 423, 430 (5th Cir.1981). The only way Plaintiff can be fully compensated is to award her prejudgment interest. *Id.*

This Court finds that the Plaintiff is entitled to damages as follows:

a. Recovery of interest paid or due on all loans made by Plaintiff to cover living expenses from date of discharge to date of this Memorandum and Order.

b. As to 1981: An amount equal to her salary as director of nurses, from the date of her discharge to the date a qualified director of nurses, i.e., a registered nurse, came on duty at the Home, with interest thereon from the date her salary payments would have been due to the date of payment.

c. As to the remainder of 1981 (after a registered nurse came on duty as director of nurses): Her wages computed at $4.80 per hour, less the amount of her actual earnings for that year subsequent to her

discharge. As to 1982: Her wages computed at $5.00 per hour, less the amount of her actual earnings for that year. As to 1983: Her wages computed at $5.25 per hour, less the amount of her actual earnings for that year. As to 1984: Her wages computed at $5.40 per hour, less the amount of her actual earnings for that year. As to that portion of 1985 to date of this Memorandum and Order: Her wages computed at $5.50 per hour, less the amount of her actual earnings to date of this Memorandum and Order.

Interest under item (c) shall be computed in accordance with the interest scale of the Department of Treasury for the compensation of postjudgment interest, from the last day of each year until paid.

Counsel for Plaintiff shall present the balances claimed due, with the rate of interest thereon, by affidavit within fifteen days. Counsel for Defendant shall respond to any claimed error by counter-affidavit within 30 days and before final judgment is entered on this Memorandum and Order.

IT IS SO ORDERED.

---

1. Because the Court finds that Weber's misconduct was not a factor in Kleppe's decision to discharge her, it need not discuss whether the discharge could be upheld as a "discharge for cause" had Weber's conduct been the actual reason for the termination.