897 F.2d 1282
 133 L.R.R.M. (BNA) 2807, 58 USLW 2544,
114 Lab.Cas. P 12,028
 Eric KOLKHORST, Plaintiff-Appellee,
v.
Edward TILGHMAN, Commissioner, Baltimore City Police
Department; Baltimore City Police Department,
Defendants-Appellants,
Elizabeth H. Dole, Secretary of Labor, Amicus Curiae.
Eric KOLKHORST, Plaintiff-Appellant,
v.
Edward TILGHMAN, Commissioner, Baltimore City Police
Department; Baltimore City Police Department,
Defendants-Appellees,
Elizabeth H. Dole, Secretary of Labor, Amicus Curiae.
 Nos. 89-3501, 89-3502.
 United States Court of Appeals,
Fourth Circuit.
 Argued Jan. 11, 1990.
Decided March 14, 1990.
 
 Otho M. Thompson, Associate Sol. (argued), Neal M. Janey, City Sol., and Ambrose T. Hartman, Deputy City Sol. (on brief), Baltimore, Md., for appellants.
 Michael Lawrence Marshall (argued), Herbert R. Weiner (on brief), Schlachman, Belsky & Weiner, P.A., Baltimore, Md., for appellee.
 Edward T. Morris (argued), Robert P. Davis, Sol. of Labor, John F. Depenbrock, Associate Sol., Barton S. Widom, Deputy Associate Sol., Helene Boetticher (on brief), Counsel for Litigation, U.S. Dept. of Labor, Washington, D.C., for amicus curiae.
 Before ERVIN, Chief Judge, WILKINSON, Circuit Judge, and YOUNG, Senior United District Judge for the District of Maryland, sitting by designation.
 ERVIN, Chief Judge:
 
 
 1
 Eric Kolkhorst ("Kolkhorst"), a police officer, brought this action for declaratory and monetary relief against his employer, the Baltimore City Police Department (the "Department"), and Bishop L. Robinson, the Department's Police Commissioner (the "Commissioner"), contending that his right, under 38 U.S.C. Sec. 2024(d), to become an active member of the Marine Corps reserves was violated by a Department policy limiting to one hundred the number of police officers (other than new hires) who are allowed to join active military reserve units. The district court granted Kolkhorst's motion for summary judgment, holding that the Department's policy violated Section 2024(d). Accordingly, the lower court entered an order directing the Department to permit Kolkhorst to join an active Marine Corps reserve unit, and awarded damages to Kolkhorst in the amount of $4,164 for lost military benefits which he would have earned had he been allowed to train with an active reserve unit. The Department and the Commissioner now appeal that decision, claiming that the court below erred in construing Section 2024(d). Kolkhorst cross-appeals the amount of damages. The Secretary of Labor filed an amicus brief, arguing that Section 2021(b)(3) of the VRRA makes it unlawful for an employer to discriminate against its employees who want to serve as active military reservists. For the reasons articulated below, we affirm the decision of the district court in all respects.
 
 I.
 
 2
 The parties are in general agreement regarding the essential facts of this case. Kolkhorst joined the Department in June of 1982. Prior to becoming a police officer, Kolkhorst had served four years on active duty in the United States Marine Corps, during which time he had attained the rank of Captain. Upon his discharge from active duty in 1977, Kolkhorst became a member of the Marine Corps Ready Reserve (the "Ready Reserve"), which is comprised of the Individual Ready Reserve (the "IRR") and the Selected Marine Corps Reserve (the "Selected Reserve"). Although Kolkhorst previously alternated between the IRR and the Selected Reserve, at the time he applied for his position with the Department, Kolkhorst was a member of IRR. All members of the Ready Reserve may be called to active duty in the event of war, a national emergency or when otherwise authorized by law. The primary distinction between the IRR and the Selected Reserve is that members of the IRR have no required training obligations, although they may participate in training if they wish. In contrast, members of the Selected Reserve must attend monthly drills and participate in an annual two-week training exercise. Thus, when Kolkhorst applied for and commenced his job with the Department, he was not a member of an active military reserve unit, and had no drill or camp obligations to satisfy.
 
 
 3
 As a result of a settlement reached in an earlier and unrelated case, Kundrat v. Pomerleau, No. 79-2198 (D.Md.1979), the Department, which employs approximately 2900 police officers, established a one hundred person limit on the number of officers who are permitted to join an active military reserve unit. Under the Department's rules, after the one hundred person limit is reached, other officers who request to join the reserves are placed on a waiting list until an opening occurs. An exception is made for those new hires who, at the time of their application for employment with the Department, are members of an active military reserve unit. These individuals are not barred from remaining an active reservist even if the one hundred person maximum has been reached. At the time Kolkhorst applied for his job with the Department, 126 officers were members of an active reservist unit, and 33 officers were on the waiting list.
 
 
 4
 When Kolkhorst completed his application for employment with the Department, he explained his situation to Department employees who instructed him to indicate on the form that he was not a member of an active military reserve unit which regularly drilled, and that he had no periodic training obligations. Thereafter, on at least two occasions in December of 1985, Kolkhorst applied for permission from the Department to join an active military reserve unit. The Department failed to respond to these applications, and on February 1, 1986, Kolkhorst accepted a three-year assignment to a Selected Reserve Unit. On February 4, 1986, Kolkhorst again submitted a request for permission to join an active reserve unit. The Department denied this request, but placed Kolkhorst on its waiting list for openings on the one hundred person reservist list. Despite the fact that the Department denied his request, Kolkhorst apparently arranged leaves of absence with his immediate superiors to enable him to train on weekends with his reserve unit. This unofficial arrangement worked well for several months.
 
 
 5
 Problems arose, however, when Kolkhorst received orders to report to Camp Lejeune in North Carolina for annual military training between July 31 and August 16, 1986. Kolkhorst informed his superior officers in late May of his upcoming training exercises. Subsequently, the Department began to inquire into Kolkhorst's reserve status, and on July 8, 1986, the Department orally informed Kolkhorst that his request for leave in order to train had been denied. On July 23, 1986, Kolkhorst received a Departmental memorandum directing him to remove himself immediately from active military reserve status. Kolkhorst complied with this directive on the following day.
 
 
 6
 On October 3, 1986, Kolkhorst brought this suit in the United States District Court for the District of Maryland, claiming that his right to become an active member of a military reserve unit under the Veteran's Reemployment Rights Act, 38 U.S.C. Secs. 2021-2026 ("VRRA"), was violated by the Department's policy restricting the number of police officers who were eligible to serve as active reservists. Kolkhorst sought both declaratory and monetary relief. The parties filed cross-motions for summary judgment, and on June 13, 1988, the lower court granted summary judgment in favor of Kolkhorst. The court held that the "Department's one hundred person limit on the number of officers who may be active reservists was unlawful," and ordered the Department to grant Kolkhorst's request that he be permitted to join the Selected Reserve. By a revised order dated February 15, 1989, the court also awarded Kolkhorst damages totalling $4,164 as compensation for lost income and benefits that Kolkhorst would have earned by participating in reservist training. These appeals followed.
 
 II.
 
 7
 As a preliminary matter, we note that summary judgments and matters of statutory construction are reviewed de novo on appeal. See Higgins v. E.I. DuPont De Nemours & Co., 863 F.2d 1162, 1166-67 (4th Cir.1988); United States v. Daughtrey, 874 F.2d 213, 218 (4th Cir.1989). Applying the foregoing standard of review to the legal questions presented by this case, we conclude that the Department's reservist policy is inconsistent with the provisions of 38 U.S.C. Sec. 2021(b)(3), that the Department's refusal to grant Kolkhorst's request for military training leave violates the broad protections afforded by 38 U.S.C. Sec. 2024(d), and that an employee may be entitled to compensation for lost pay and benefits under 38 U.S.C. Sec. 2022 in cases where an employer unlawfully refuses to allow a reservist to participate in military training.
 
 III.
 
 8
 The VRRA provides that any employee of a state, or a political subdivision thereof, "shall not be denied hiring, retention in employment, or any promotion or other incident or advantage of employment because of any obligation as a member of a Reserve component of the Armed Forces." 38 U.S.C. Sec. 2021(b)(3). In Monroe v. Standard Oil Co., 452 U.S. 549, 559-60, 101 S.Ct. 2510, 2516-17, 69 L.Ed.2d 226, 235-36 (1981), the Supreme Court reviewed the legislative history of Section 2021(b)(3), and concluded that this provision
 
 
 9
 was enacted for the significant but limited purpose of protecting the employee-reservist against discriminations like discharge and demotion motivated solely by reserve status. Congress wished to provide protection to reservists comparable to that already protecting the regular veteran from "discharge without cause"--to insure that employers would not penalize or rid themselves of returning reservists after a mere pro forma compliance with Sec. 2024(d). And the consistent focus of the administration that proposed the statute, and of the Congresses that considered it, was on the need to protect reservists from the temptation of employers to deny them the same treatment afforded their co-workers without military obligations.
 
 
 10
 Thus, employees covered by Section 2021(b)(3), such as Kolkhorst, may not be discriminated against by their employers or otherwise placed at a disadvantage by them because of their service in the military reserves. In this case, the Department's written order instructing Kolkhorst to either withdraw from the active reserves or face dismissal strikes to the very heart of Section 2021(b)(3)'s prohibition against terminating an employee because of his reservist training obligations. Simply stated, the Department planned to fire Kolkhorst, without cause, if he insisted on exercising his statutory right to train with a military reserve unit. This otherwise unjustified threat of termination represents an impermissible encroachment upon the normal incidents and advantages of Kolkhorst's employment. Accordingly, we hold that the Department's official reservist policy, which clearly precipitated the unlawful measures taken by the Department and the Commissioner, conflicts directly with the language and purpose of Section 2021(b)(3), and cannot be countenanced thereunder.
 
 IV.
 
 11
 We turn next to the question of whether the Department's refusal to grant Kolkhorst leave for military reservist training constituted a violation of 38 U.S.C. Sec. 2024(d). That provision of the VRRA provides:
 
 
 12
 Any [military reservist] shall upon request be granted a leave of absence by such person's employer for the period required to perform active duty for training or inactive duty training in the Armed Forces of the United States. Upon such employee's release from a period of such active duty for training or inactive duty training, or upon such employee's discharge from hospitalization incident to that training, such employee shall be permitted to return to such employee's position with such seniority, status, pay, and vacation as such employee would have had if such employee had not been absent for such purposes....
 
 
 13
 38 U.S.C. Sec. 2024(d). In Monroe, the Supreme Court noted that Section 2024(d) was enacted "to deal with the problems faced by employees who had military training obligations lasting less than three months. This section provides that employees must be granted a leave of absence for training and, upon their return, be restored to their position with such seniority, status, pay, and vacation as they would have had if they had not been absent for training." 452 U.S. at 555, 101 S.Ct. at 2514, 69 L.Ed.2d at 232-33 (1981) (citations omitted).* The issue raised by the parties in this case is whether a standard of reasonableness should be read into Section 2024(d), as has been done by a number of other federal courts.
 
 V.
 
 14
 The reasonableness standard was first applied to 38 U.S.C. Sec. 2024(d) in Lee v. City of Pensacola, 634 F.2d 886 (5th Cir.1981), which was decided approximately five months before the Supreme Court's decision in Monroe. In Lee, the Fifth Circuit quoted with apparent approval from the district court's opinion, which concluded:
 
 
 15
 Congress [in enacting Section 2024(d) ] did not intend thereby to endow a reservist with unreasonable powers over his employer or cause his employer unreasonable hardship. The training period for which leave of absence is given must be reasonable both in the context of the reservist's military obligation and the requirements of the employer.
 
 
 16
 Id. at 888. Thus, Lee is often cited for the proposition that, despite the unequivocal and unqualified language of Section 2024(d), a reservist is entitled to a leave of absence from his job in order to participate in military training only if the reservist's request is reasonable with regard to both the employee and the employer. Several jurisdictions have followed Lee and applied a standard of reasonableness under Section 2024(d). See, e.g., Gulf States Paper Corp. v. Ingram, 811 F.2d 1464, 1468-69 (11th Cir.1987); Bottger v. Doss Aeronautical Services, Inc., 609 F.Supp. 583, 586 (M.D.Ala.1985); Anthony v. Basic American Foods, Inc., 600 F.Supp. 352, 355 (N.D.Cal.1984). The formulation of the standard of reasonableness has varied markedly among these courts, however.
 
 
 17
 In Anthony, for example, the court held that a reservist's "leave request should be evaluated according to whether it was reasonable both in light of 1) the circumstances giving rise to the request and 2) the requirements of the employer." 600 F.Supp. at 355. In contrast, the Bottger court suggested that the reasonableness of a request for a leave of absence turned on the "totality of the circumstances." 609 F.Supp. at 586. In Ingram, the principal decision relied upon by the court below, the Eleventh Circuit held that reasonableness depended primarily on the conduct of the employee, and only to a lesser extent on the duration of the requested leave and the burden that was placed upon the employer because of the leave. 811 F.2d at 1469. It should also be noted that the Ingram court expressly stated that a reservist's request for leave was presumed to be reasonable, and that, absent questionable conduct by the employee, "the reasonableness test most likely will be satisfied." Id. at 1470. In other words, the burden upon an employer alone is insufficient to bar a reservist's request under Ingram. Id. In Lemmon v. Santa Cruz County, Cal., 686 F.Supp. 797, 854 (N.D.Cal.1988), the court added its view that "the type, duration and frequency of any particular course of military training must also be presumed reasonable."
 
 VI.
 
 18
 We do not believe that reasonableness is required under Section 2024(d). There is nothing in the VRRA, its legislative history, or the Monroe decision to indicate that a reservist is entitled to a leave of absence in order to participate in military training only if the request is reasonable based on a judicially created standard that varies from one jurisdiction to the next. Rather, the VRRA unconditionally provides that any reservist "shall upon request be granted a leave of absence by such person's employer for the period required to perform active duty for training or inactive duty training in the Armed Forces of the United States." 38 U.S.C. Sec. 2024(d) (emphasis added). In Monroe, the Supreme Court emphasized that under Section 2024(d) "employees must be granted a leave of absence for training and, upon their return, be restored to their position with such seniority, status, pay, and vacation as they would have had if they had not been absent for training." 452 U.S. at 555, 101 S.Ct. at 2514, 69 L.Ed.2d at 233 (emphasis added). In short, the reasonableness standards that have been imposed by other courts are contrary to the purpose of Section 2024(d) to allow reservists to train with their military units without suffering prejudice or any adverse action from their employers.
 
 
 19
 Even if a standard of reasonableness were applied to Section 2024(d), we believe that Kolkhorst's request for training leave was reasonable and that the Department's policy limiting to one hundred the number of police officers that are eligible to serve as active military reservists is unreasonable per se under any possible formulation of the test. First, Kolkhorst's requested leave for reserve duty was reasonably made and reasonable in content. He submitted three applications for training leave to the Department. The first request was made more than two months before his training was scheduled to commence, which we conclude was reasonable. Moreover, contrasted against the requests found in other published cases brought under Section 2024(d), the duration of the leave sought by Kolkhorst for routine and mandatory training clearly falls within the statute's intended scope.
 
 
 20
 In Ingram, for example, the reservist requested a one-year leave of absence to attend a voluntary nursing program. The request was held to be reasonable. 811 F.2d at 1466, 1470. In Lee, the reservist had requested and received a seven-week leave of absence to attend an officer training course. A few days before the expiration of the original leave of absence, the reservist applied for and was denied a five-month extension in order to complete additional parts of the training program. In that case, the supplemental request for leave was deemed to be unreasonable. 634 F.2d at 887-88, 890. In Lemmon, the court stated that a three-year leave of absence for purposes of specialized technical training was not inherently unreasonable. 686 F.Supp. at 802. In Cronin v. Police Dept. of the City of N.Y., 675 F.Supp. 847, 853 (S.D.N.Y.1987), the court held that two consecutive leaves of absence for fourteen and thirteen months respectively for flight engineer training were reasonable. Finally, in Bottger, the court found that a request for a 26-day leave for special training immediately after a two-week leave for routine summer training was reasonable as a matter of law. 609 F.Supp. at 587.
 
 
 21
 Second, the Department's reservist policy is unreasonable per se because it prevents any active military training at all for individuals like Kolkhorst who are not on the one hundred person reservist list. In other words, the Department does not even consider the reasonableness of an employee's request for leave if the employee is not one of the one hundred persons eligible for reservist training. By illustration, if all one hundred persons on the Department's reservist list request leave to train during eleven months of the year, and an individual on the waiting list applies for leave in the twelfth month, the request will be denied summarily merely because the employee is not on the approved list, and not because the request is demonstrably unreasonable or places an unreasonable burden on the Department. In other words, the policy presumes that any request for leave made by an individual not on the one hundred persons list is unreasonable. The Department thus asks that this court apply a standard of reasonableness, when its own policy lacks any semblance of reasonableness. Therefore, if we were to apply a reasonableness standard under Section 2024(d), we would find that Kolkhorst's request for leave was entirely reasonable, and that the Department's arbitrary policy was not.
 
 VII.
 
 22
 Monetary damages as compensation for violations of Section 2024(d) are authorized by 38 U.S.C. Sec. 2022, which provides that a district court has the power, regarding an employer who violates a person's rights under the VRRA,
 
 
 23
 to require such employer to comply with such provisions and to compensate such person for any loss of wages or benefits suffered by reason of such employer's unlawful action. Any such compensation shall be in addition to and shall not be deemed to diminish any of the benefits provided for in such provisions.
 
 
 24
 38 U.S.C. Sec. 2022. Kolkhorst argues that the plain language of Section 2022 requires that the failure of an employer to grant a leave request in violation of Section 2024 exposes that employer to liability for damages sustained by the reservist as a result of the employer's wrongful action. On the other hand, the Department asserts that Section 2022 applies only to wages and benefits which the employee would have earned from an employer, and not to income derived from the employee's military duty. Although there are no published cases directly on point, the express language of Section 2022 seems to accommodate Kolkhorst's claim for damages. That provision states that district courts are empowered to compensate a reservist "for any loss of wages or benefits suffered by reason of such employer's unlawful action." 38 U.S.C. Sec. 2022 (emphasis added). There is no dispute in this case that Kolkhorst was deprived of military duty pay and privileges when the Department ordered him to resign from the Ready Reserves and precluded him from training with his reserve unit. It should be noted that, under the Department's existing policies, all active reservists are entitled to fifteen days of paid leave per year to train with their reserve units, in addition to whatever vacation leave they have earned. We can see no reason, therefore, why Kolkhorst should not be allowed to recover on his damages claim.
 
 
 25
 However, Kolkhorst's cross-appeal on the amount of damages is denied because "[t]he trial court, as a fact-finder, possesses considerable discretion in fixing damages, and its decision will be upheld absent clear error." Little Beaver Enterprises v. Humphreys Railways, Inc., 719 F.2d 75, 79 (4th Cir.1983); Polo Fashions, Inc. v. Craftex, Inc., 816 F.2d 145, 149 (4th Cir.1987) (also applying the clearly erroneous standard). We conclude that the award of damages in this case was not clearly erroneous.
 
 VIII.
 
 26
 Based on the foregoing discussion, the judgment of the court below is AFFIRMED.
 
 
 
 *
 At the time Monroe was decided, most reservist training could be accomplished within 90 days. Indeed, the most prevalent form of training for reserve units was, and remains, the two-week summer camp plus monthly drills. Under the current statutory scheme, however, valid leave requests of substantially longer duration are not uncommon. See, e.g., Ingram, Lemmon, Cronin and Bottger, which are discussed briefly in Part VI of this opinion