**Charles W. BEATTIE, Plaintiff,**

v.

**The TRUMP SHUTTLE, INC., Defendant.**

**Civ. A. No. 90–1160.**

United States District Court, District of Columbia.

March 5, 1991.

**31**

William A. Dobrovir, Washington, D.C., for plaintiff.

Eugene Mittelman, Dreyer and Traub, New York City, for defendant.

## MEMORANDUM OPINION

FLANNERY, District Judge.

This matter comes before the Court upon defendant's motion for summary judgment and upon plaintiff's motion for partial summary judgment. At issue is whether defendant The Trump Shuttle ("Trump") violated the Veteran's Reemployment Rights Act ("VRRA"), 38 U.S.C. §§ 2021–2026, by failing to hire plaintiff Beattie, who was fulfilling military reserve duties at the time of his application for employment. The Court finds that Trump's refusal to hire Beattie violated Beattie's rights under the VRRA and the Court will grant plaintiff's motion and deny defendant's motion.

### I. Background

The material facts in this matter are not in dispute. On February 11, 1988, Charles Beattie, a pilot employed by Eastern Air Lines, Inc. ("Eastern") and a colonel in the United States Air Force Reserve, requested leave from Eastern to attend the Industrial College of the Armed Forces. The Industrial College is a section of the National Defense University devoted to the study of the political, military and economic strengths of the world's major nations. Admission to the college is quite competitive and prestigious, and successful completion of the course of studies offered there is a prerequisite for military career advancement. Eastern granted Beattie's request for a leave of absence, and, on May 27, 1988, Beattie submitted to Eastern a

copy of his orders to attend the Industrial College from August 8, 1988 until June 15, 1989. Beattie began his leave on August 8, 1988.

On October 12, 1988, during Beattie's military leave, Trump entered into an agreement with Eastern to purchase the assets and operations of Eastern's shuttle division. The shuttle service consists of scheduled air carrier operations in the Washington, D.C., Boston, and New York markets. Pursuant to the purchase agreement, Trump extended offers of employment to all Eastern personnel, by job position, with hiring preferences to be based upon each applicant's seniority status at Eastern. Trump ultimately hired approximately 200 pilots. Trump admits that Beattie possessed the requisite seniority to have been selected from within the group of applicants for pilot positions.

Trump's offers of employment required that all applicants be available for training approximately two weeks prior to the scheduled commencement of Trump operations on February 1, 1989.[1] Beattie submitted an application for employment by the specified deadline of December 12, 1988 despite his military commitment, which made it impossible for him to begin employment by mid-January. In or about December, 1988, Trump informed Beattie that he would not be hired because of his unavailability on the anticipated date of commencement of Trump operations.

Beattie completed his duties at the Industrial College on June 15, 1989. He never applied for reinstatement to his former position at Eastern, although his position at Eastern still existed and was available to him. There is no evidence showing that Beattie had been assigned to Eastern's shuttle division previous to his military leave or that Trump's purchase of the shuttle had eliminated Beattie's former position.

1. Trump did not actually commence operations until June 7, 1989. This delay was caused primarily by Trump's inability to obtain certification from the United States Department of Transportation. Further delay was caused by the International Association of Machinist's strike against Eastern and Eastern's subsequent filing of a petition in bankruptcy. All hiring had been completed by January 1989, however, and no additional offers of employment resulted from the delay.

On May 17, 1990, Beattie filed a complaint alleging that Trump violated the VRRA and seeking relief including employment, back pay, and damages. Trump moved for summary judgment on November 19, 1990, and Beattie moved for partial summary judgment on November 29, 1990. Because there are no genuine issues of material fact, the Court will address the legal issues raised by the parties in their motions and will determine Trump's liability to Beattie under the VRRA.

## II. Summary Judgment

Fed.R.Civ.P. 56(c) provides that summary judgment

> shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages.

*Id.* In considering motions for summary judgment, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

Although the parties in this matter have not yet commenced discovery, the pleadings and affidavits in support of their motions document that no genuine issue exists as to any fact that might affect the outcome of this suit. *See White v. Fraternal Order of Police*, 909 F.2d 512, 516–17 (D.C. Cir.1990) (District Court did not abuse discretion by staying discovery prior to issuing summary judgment rulings because record was adequate to determine whether standards of Fed.R.Civ.P. 56(c) were met). The facts in this action may be summarized briefly: (1) Trump extended offers of employment to all Eastern employees based upon their seniority status; (2) Beattie was an Eastern pilot possessing the requisite seniority; (3) Trump declined to hire Beattie based upon his unavailability on the specified commencement date; and (4) Beattie's unavailability was caused by his military commitment.

The Court thus finds that the pleadings and affidavits in this matter have established all material facts necessary to determine the liability issues raised by the parties. As discussed below, the Court finds Beattie's motion to be dispositive of those issues and will address that motion first.

## III. Beattie's Motion for Partial Summary Judgment: 38 U.S.C. § 2021(b)(3)

Section 2021(b)(3) of the VRRA provides that

> [a]ny person who seeks or holds a position described in clause (A) or (B) of subsection (a) of this section shall not be denied hiring, retention in employment, or any promotion or other incident or advantage of employment because of any obligation as a member of a Reserve component of the Armed Forces.

38 U.S.C. § 2021(b)(3). Trump is subject to § 2021(b)(3) via § 2021(a)(2)(B), which encompasses "position[s] ... in the employ of ... a private employer ..." *Id.* § 2021(a)(2)(B).

Beattie argues that § 2021(b)(3) provides an absolute bar against employer discrimination in initial hiring decisions based upon an applicant's military reserve obligations. Beattie contends that Trump acted in violation of the VRRA by failing to hire Beattie based solely upon his military reserve commitment.

Trump raises a number of arguments in response. First, he argues that Beattie's attendance at the Industrial College was not an "obligation" within the meaning of § 2021(b)(3). Second, Trump contends that even if it were an "obligation," § 2021(b)(3) protects only Beattie's right to reinstatement to his former position by his former employer. Finally, Trump interprets the relevant provision only to prohibit employers from discriminating against applicants who are presently available to begin work.

The arguments advanced by the parties present the Court with questions of

statutory interpretation. As in any case of statutory interpretation, the Court begins by examining the text of the statute. The plain language of § 2021(b)(3) quickly disposes of Trump's argument that the VRRA protects only Beattie's right to reinstatement. Section 2021(b)(3) clearly provides protection against discrimination to any reservist "who *seeks* or holds" an employment position. 38 U.S.C. § 2021(b)(3) (emphasis added). The provision also provides that a reservist "shall not be denied *hiring*, retention in employment, or any promotion ..." *Id.* (emphasis added). Clearly, § 2021(b)(3) prohibits discrimination based upon reserve obligations against the first-time job applicant as well as against the employee seeking to return to his or her previous position.

The legislative history of § 2021(b)(3) confirms this result. Section 2021(b)(3) of the VRRA was amended in 1986. The amendment was introduced as H.R. 2798, 99th Cong., 1st Sess., passed by the House on June 17, 1986, and adopted in Conference on October 8, 1986.[2] *See* 1986 U.S. Code Cong. & Admin. News 5468, 5572, 5594 (1986). There had been no comparable Senate bill. *Id.* at 5594.

The legislative history of the 1986 amendment, *see* H.R.Rep. No. 99–626, 99th Cong., 2d Sess., (1986), suggests that it was intended to close a loophole in the existing version of the VRRA, namely, that the law protected reservists seeking to return to previously held jobs but did not protect reservists from discrimination in initial job applications. "Current law ... provides no protection for members of the Guard and Reserve against discrimination in initial employment because a job seeker is a member of a reserve component." *Id.* at 2. Congress feared that some employ-

ers would be reluctant to hire reservists because of their military commitments. *Id.* at 2, 4. The 1986 amendment was designed to prevent such employment discrimination. "We agree with the purpose of the bill. We believe that as in the situation of veterans' reemployment, no person should be denied initial employment because of a Reserve or National Guard commitment." *Id.* at 5 (Statement of Donald E. Shasteen, Ass't Sec'y for Veterans' Employment and Training, Dep't of Labor).

Thus, the legislative history of the amendment to § 2021(b)(3) confirms what the plain language of the statute makes clear—that the section protects reservists from discrimination when initially applying for employment as well as when returning to a previously held position.[3]

Trump's third objection—that § 2021(b)(3) protects only reservists immediately available to begin work—is also refuted by the language of the statute. On its face, § 2021(b)(3) does not distinguish between reservists presently fulfilling military duties and those who may be called to duty at some future time. Of course, the factual basis of this case is a unique one. The Court recognizes that few reservists seek to change their employment status and acquire new jobs while on reserve duty. At the same time, however, Trump's one-time offer of employment—to a select class of individuals needed to start up a new enterprise—is also a unique occurrence. Had Beattie not applied for employment while attending the Industrial College, his opportunity to obtain employment with Trump at his current seniority level would have been permanently foreclosed.

---

**2.** Section 2021(b)(3) of the VRRA was amended by § 331 of the Veterans' Benefits Improvement and Health–Care Authorization Act of 1986, Pub.L. No. 99–576, § 331, 100 Stat. 3248, 3279 (1986):

Sec. 331, EMPLOYMENT RIGHTS OF CERTAIN INDIVIDUALS

Section 2021(b)(3) is amended—

(1) by inserting "seeks or" after "who";

(2) by inserting "hiring," after "shall not be denied"; and

(3) by inserting a comma after "employment" the first place it appears.

**3.** For these same reasons, Beattie's failure to apply for reinstatement to his former position at Eastern is not relevant nor is it a prerequisite to an action under § 2021(b)(3). The 1986 amendment expressly addresses hiring decisions and, therefore, encompasses situations in which reservists seek to change employment, regardless of their motives or whether they have first pursued remedies against their present employer.

Trump argues that it denied Beattie a job because he was unavailable, not because he was a reservist. The Court does not doubt this to be true, and it notes that many of Trump's pilots are also reservists.[4] But the simple fact is that Beattie was unavailable *because of* his military duty. The language of § 2021(b)(3) prohibits a reservist from being denied employment because of "any obligation as a member of a Reserve component." 38 U.S.C. § 2021(b)(3). The statute does not condition its protection upon the reservist's availability at a time specified by the employer. Although the Court sympathizes with Trump's business needs, Congress has, through the VRRA, expressed a policy decision that employees and job applicants are to be given unconditional protection against discrimination based upon their conflicting military duties. Such a policy decision necessarily requires that employers will bear the burden of obtaining replacement labor services when their employees are fulfilling their reserve duties.[5] Congress has chosen to extend such protection to job applicants as well as to existing employees, and the Court will not read the statute to diminish this protection by conditioning it upon the availability of the reservist-applicant.

Beattie is further aided in his interpretation of § 2021(b)(3) by Supreme Court and Circuit Court precedent holding that the VRRA is to be liberally construed in favor of the reservist. *See Coffy v. Republic Steel Corp.*, 447 U.S. 191, 196, 100 S.Ct. 2100, 2104, 65 L.Ed.2d 53 (1980); *Fishgold v. Sullivan Drydock & Repair Corp.*, 328 U.S. 275, 285, 66 S.Ct. 1105, 1111, 90 L.Ed. 1230 (1946); *Shadle v. Superwood Corp.*,

858 F.2d 437, 439 (8th Cir.1988). It would certainly be anomalous to suggest that the law protects the reservist who applies for a job the day before commencing active military duty and not the reservist who applies prior to the completion of his or her duty. The statutory protection is further warranted on the facts of this case, in which a one-time offer of employment was made and in which the plaintiff was near the midpoint of his active duty at the time of the offer.

In sum, Trump asks the Court to read the word "hiring" in § 2021(b)(3) to mean "immediate hiring." Although this reading may seem reasonable and may better accommodate Trump's business needs, it is the language chosen by Congress that must prevail, and Congress did not choose to qualify its protection of reservist-job applicants based upon their immediate availability. *Cf. Kolkhorst v. Tilghman*, 897 F.2d 1282, 1285–87 (4th Cir.1990) (VRRA unconditionally protects reservists right to military leave of absence; Court will not diminish protection by requiring that reservist's request for leave be reasonable), *petition for cert. filed*, No. 89–1949 (June 12, 1990). Trump's argument would serve to diminish the protection that the VRRA offers to reservists, and to shift some of the costs of the military protection of this country from the employer to the employee. It is the province of Congress to make such policy choices, and Congress has chosen to offer unqualified protection to the reservist. For these reasons, the Court finds that Beattie's unavailability on the anticipated commencement date of Trump

4. The fact that Trump hired other reservists diminishes the force of its argument. Trump contends that it could not hire Beattie because it needed a full contingent of qualified pilots in order to maintain its shuttle operations. But if many of Trump's pilots are reservists and are eligible to be called up to active military duty, then Trump must (or should) have some plan for accessing contingent labor supplies. The fact that Trump may not have desired to undertake such contingency plans does not excuse Trump from its statutory duty not to refuse to hire job applicants based upon their reserve obligations.

5. Congress also feared that discrimination by employers would discourage participation in the National Guard and Reserve:

Increased dependence on the Guard and Reserve may well result in longer and more frequent training. In order to avoid the generally minor disruptions which can be caused by an employee's status as a reservist, some employers will undoubtedly discriminate against job applicants who serve in a Reserve component. The result of this sort of action is a decreased willingness of individuals to join and serve in the Guard or Reserve.

H.R.Rep. No. 99–626, 99th Cong., 1st Sess. 3 (1986).

operations does not deprive Beattie of his rights under § 2021(b)(3) of the VRRA.

Trump's remaining argument—that Beattie's attendance at the Industrial College was not an "obligation" within the meaning of § 2021(b)(3)—must also be resolved in favor of Beattie. Trump argues that Beattie volunteered to attend the Industrial College and that § 2021(b)(3) only provides protection against discrimination based upon reserve "obligations."

 In support of its argument, Trump cites to 10 U.S.C. § 270(a), which it contends defines the obligations of Reserve members. That section provides that any member of the Ready Reserve shall be required to

(1) participate in at least 48 scheduled drills or training periods during each year and serve on active duty for training not less than 14 days (exclusive of traveltime) during each year;

(2) serve on active duty for training not more than 30 days during each year.

10 U.S.C. § 270(a). Although § 270(a) does set forth certain reserve training requirements, the Court finds that this section does not define the term "obligation" used in § 2021(b)(3). First, § 270(a) does not use the word "obligation" nor does it make reference to § 2021(b)(3). Second, § 270(a) does not purport to be a comprehensive list of the training requirements of reservists, leaving open the possibility that reservists may be "obligated" to perform certain duties not enumerated in § 270(a). Third, § 270(a) applies only to members of the Ready Reserve component of the armed forces, while § 2021(b)(3) is broader and protects any member of "*a* Reserve component of the Armed Forces." 38 U.S.C. § 2021(b)(3) (emphasis added).[6] The Ready Reserve system is only one component of

the armed forces reserve system.[7] Trump's argument would deny the protection of § 2021(b)(3) to those reservists not assigned to the Ready Reserve component on the grounds that their reserve duties cannot be considered "obligations."

The Court finds that § 270(a) does not define the word "obligations" used in § 2021(b)(3) because § 270(a) does not purport to serve such a function, because it may not be a comprehensive list of obligations, and because it does not address itself to all Reserve members. Recognizing § 2021(b)(3)'s purpose of preventing discrimination against reservists, and liberally construing the statute in favor of the reservist, the Court cannot conclude that the reserve "obligations" encompassed by § 2021(b)(3) are limited to those enumerated in § 270(a).

Relevant case law also supports this interpretation of § 2021(b)(3). In *Monroe v. Standard Oil Co.*, 452 U.S. 549, 562–63, 101 S.Ct. 2510, 2518, 69 L.Ed.2d 226 (1981), the Supreme Court noted that § 2021(b)(3) has been applied to protect reservists in performance of a variety of military reserve duties.

Section 2021(b)(3) has been applied, for example, to 2–week summer camps, *Carney v. Cummins Engine Co.*, 602 F.2d 763 (CA7); 6–week training sessions, *Carlson v. New Hampshire Dept. of Safety*, 609 F.2d 1024 (CA1); and two-month training sessions, *Peel v. Florida Dept. of Transportation*, 443 F.Supp. 451 (ND Fla.), aff'd, 600 F.2d 1070 (CA5).

*Id.* Trump argues that all of these cases involved leaves of absences or accommodations by existing employers, and that no case has applied § 2021(b)(3) to a case involving an initial hiring. Although Trump is correct, it ignores the fact that § 2021(b)(3) was amended in 1986 with the

---

**6.** Section 270(a)'s training requirements may not even apply to the entire Ready Reserve. "Within the Ready Reserve of each of the reserve components, there is a Selected Reserve, consisting of units, and, as designated by the Secretary concerned, of Reserves, trained in the manner prescribed in section 270(a)(1) of this title or section 502(a) of title 32, as appropriate." 10 U.S.C. § 268(b).

**7.** "There are in each armed force a Ready Reserve, a Standby Reserve, and a Retired Reserve. Each Reserve shall be placed in one of those categories." 10 U.S.C. § 267(a). "The Ready Reserve consists of units or Reserves, or both, liable for active duty as provided in sections 672 and 673 of this title. The authorized strength of the Ready Reserve is 2,900,000." 10 U.S.C. § 268(a).

express intention of extending its protection to initial hiring situations. Prior to 1986, the statute only protected reservists seeking to return to previously held positions.

█ Although none of the above cases expressly involved an interpretation of the term "obligation" in § 2021(b)(3), one recent case from the Fourth Circuit does provide helpful precedent. *Kolkhorst v. Tilghman,* 897 F.2d 1282 (4th Cir.1990), *petition for cert. filed,* No. 89-1949 (June 12, 1990), involved a challenge to the Baltimore City Police Department's policy that not more than 100 of its officers should be members of active military reserve units. *Id.* at 1283. Plaintiff, a Baltimore police officer, was a member of the Marine Corps Individual Ready Reserves ("IRR"). *Id.* Kolkhorst's IRR service imposed no training obligations upon him, but it allowed him to volunteer for training with active reserve units. *Id.* After failing to obtain permission from his employer to take leave to attend training, Kolkhorst unilaterally arranged to attend training on weekends. *Id.* at 1284. Defendant responded by ordering Kolkhorst to withdraw from active duty or face dismissal. *Id.* at 1285.

The Fourth Circuit affirmed the District Court's finding that the Police Department had violated § 2021(b)(3). "[E]mployees covered by Section 2021(b)(3), such as Kolkhorst, may not be discriminated against by their employers or otherwise placed at a disadvantage by them because of their service in the military reserves." 897 F.2d at 1285. Although it never expressly defined the meaning of "obligation" as used in § 2021(b)(3), the Court obviously concluded that Kolkhorst's voluntary training was the type of military service protected by the statute.

The facts of this case compare favorably to those of *Kolkhorst.* At the time of Trump's offer of employment, Beattie was nearing the mid-point of his attendance at the Industrial College. Further, Beattie was attending the college under orders from his commanding officer. Even though he had requested these orders, and thus if his decision to enroll at the college

could be characterized as voluntary, his completion of his course of studies became mandatory upon his matriculation. Beattie was under orders to attend the Industrial College until June 15, 1989, and when Trump extended its offer of employment in December 1988, Beattie was not at liberty to abandon his military duties in order to make himself available for immediate employment. In short, his attendance at the Industrial College had become an "obligation" from which he was unable to withdraw, unlike the plaintiff in *Kolkhorst,* who was held to be protected by § 2021(b)(3).

Trump's refusal to hire Beattie based upon his military obligation was in direct violation of both the language and purpose of § 2021(b)(3). Beattie was under an obligation to attend the Industrial College from August 1988 until June 1989. The fact that Beattie was initially applying for employment, in contrast to the plaintiff in *Kolkhorst* who was seeking reinstatement, is of no consequence because the protection of § 2021(b)(3) has been extended to encompass reservists seeking employment as well as those seeking to return to previous employment. The Court thus concludes that Trump did discriminate against Beattie based upon his military reserve obligations, and it finds Trump liable to Beattie under § 2021(b)(3) of the VRRA.

IV. Trump's Motion for Summary Judgment: 38 U.S.C. § 2021(a)(2)(B)(i)

Trump reads Beattie's complaint to allege that Trump incurred a duty to rehire Beattie as a "successor in interest" to Eastern, pursuant to 38 U.S.C. § 2021(a)(2)(B)(i). Trump argues that Beattie fails to present a claim under 38 U.S.C. § 2021(b)(3). Beattie denies that he bases his complaint solely upon § 2021(a)(2)(B)(i) of the VRRA, yet he also opposes Trump's summary judgment motion by arguing that Trump is a successor in interest to Eastern.

The Court finds that Beattie's complaint states a claim for relief under § 2021(b)(3). In the first paragraph of his complaint, Beattie brings "an action for violation of the Vietnam Veterans' Readjustment Assistance Act ("the Act"), 38 U.S.C.

§§ 2021–2024 ...'' The complaint further alleges that Trump extended offers of employment to Eastern pilots based upon seniority, and that Trump failed to hire Beattie "because he was on military leave." Complaint ¶ 26. Although the complaint makes allegations that Trump is the successor in interest to Eastern, it also claims that Trump wrongfully failed to hire Beattie. Fed.R.Civ.P. 8(a) requires that the complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief, ...'' *Id.* Beattie's complaint certainly satisfied this criteria and served to place Trump on notice that Beattie sought relief under § 2021(b)(3).

Because the Court's findings pursuant to § 2021(b)(3) are dispositive of the issue of Trump's liability under the VRRA, the Court will decline to address the issues raised in Trump's summary judgment motion and in Beattie's opposition thereto.

### V. Conclusion

For the foregoing reasons, the Court finds that Trump's refusal to hire Beattie violated 38 U.S.C. § 2021(b)(3) of the VRRA, and it will grant Beattie's motion for partial summary judgment and deny Trump's motion for summary judgment.[8] An appropriate Order accompanies this Memorandum Opinion.

8. Beattie also moves the Court to grant him specified relief, including employment with Trump, backpay, prejudgment interest and attorneys' fees. The Court declines to order relief at this time and will delay any remedial order pending further proceedings in this matter.