**Charley D. HILL, Plaintiff–Appellant,**

v.

**MICHELIN NORTH AMERICA, INCORPORATED, Defendant–Appellee.**

No. 00–2202.

United States Court of Appeals, Fourth Circuit.

Argued March 1, 2001.

Decided May 30, 2001.

Before WILKINS, MOTZ, and TRAXLER, Circuit Judges.

Affirmed in part, reversed in part, and remanded by published opinion. Judge TRAXLER wrote the opinion, in which Judge WILKINS and Judge MOTZ joined.

## OPINION

TRAXLER, Circuit Judge:

Charley D. Hill appeals from the district court's grant of summary judgment in favor of Michelin North America, Incorporated, on Hill's claims under the Uniformed Services Employment and Reemployment Rights Act of 1994 ("USERRA"), 38 U.S.C.A. §§ 4301–4333 (West Supp.2000). We affirm in part, reverse in part, and remand for further proceedings.

### I.

Hill began working for Michelin in the early 1980s, and he became a member of the United States Naval Reserves in 1995. In 1997 Hill took medical leave for a back injury. He returned to work in February 1998 with light duty restrictions and in April 1998 was placed in a position in the "Q–Laboratory" section of "Service R."

Hill contends that he reported to the Q–Laboratory and that his new supervisor looked "distraught" when Hill informed him about Hill's Reserve obligations, including the need to take approximately two weeks off in July. J.A. 35. According to Hill, the supervisor called him at home and expressed concern about whether the Q–Laboratory, which only had around fourteen employees, could accommodate Hill's Reserve schedule. Hill's supervisor talked to employees in Michelin's personnel department to see if Hill could be moved to a position in another area that could more easily accommodate his Re-

**ARGUED:** Mary Christine McCormac, Clemson, SC, for Plaintiff–Appellant. Fred W. Suggs, Jr., Ogletree, Deakins, Nash, Smoak & Stewart, P.C., Greenville, SC, for Defendant–Appellee. **ON BRIEF:** Steven M. Krause, Law Offices of Steven M. Krause, Anderson, SC, for Plaintiff–Appellant. M. Lavan Green, Jr., Ogletree, Deakins, Nash, Smoak & Stewart, P.C., Greenville, SC, for Defendant–Appellee.

serve schedule. Shortly after his transfer to the Q–Laboratory, Hill was transferred to a production position in "Service Z." Although Hill selected the Service Z position from a list of available positions,[1] Hill claims that he liked his position in the Q–Laboratory and that he did not want to be transferred.

Michelin, however, contends that as soon as Hill was transferred to the Q–Laboratory, Hill expressed concern about the effect his Reserve schedule would have on the other employees in the area, believing that they would resent having to work overtime to cover for him. Michelin says that it assured Hill that the Q–Laboratory could accommodate his Reserve obligations, but that Hill still wanted to be transferred to another department. Lisa Snead, a Michelin area personnel manager, then showed Hill a list of available positions, and Hill elected to transfer to Service Z.

In any event, Hill was to work in the Q–Laboratory for the first part of the week beginning Monday, April 27, and then move to Service Z. With the approval of his Q–Laboratory supervisor, however, Hill took a vacation day on Tuesday, April 28.

Hill returned to work in the Q–Laboratory on Wednesday, April 29. That day, he met with Snead, who had reviewed Hill's personnel file in connection with the transfer and noticed that Hill had used more than fourteen vacation days since he returned to work in February. Snead suggested that Hill should slow down the rate at which he was using his vacation

days, and she reminded him to save some vacation days for upcoming plant closures.[2]

Hill reported for work in Service Z on Thursday, April 30, and Tim Putnam, Hill's Service Z supervisor, asked Hill "whether [he] would have 40 hours that week," J.A. 106. Hill responded that he would. Putnam asked Hill to fill out a time card and Putnam found the completed card on his desk when he arrived at work the next Monday. The time card showed that Hill had worked forty hours for the week of April 27 through May 1, including eight hours on Tuesday, April 28. The time card did not show that Hill had used vacation time on Tuesday.

When Hill's time card was submitted to the personnel department, an employee noticed the discrepancy regarding the vacation day on Tuesday. That employee brought the issue to Snead's attention. Snead asked Putnam to meet with Hill and give him an opportunity to correct the time card. Snead instructed Putnam to ask Hill whether he had taken any vacation that week.

Putnam met with Hill, showed Hill the time card, and asked Hill if it was correct. Hill responded that it was. According to Putnam and others who listened to the conversation, Putnam specifically asked Hill if he had taken any vacation during that week, which Hill denied. Hill, however, contends that Putnam did not specifically ask whether Hill had taken any vacation during the previous week.

Snead then met with Hill to discuss the time card issue. Snead testified that when she told Hill she needed to talk to him

---

1. Hill first selected a position in another area, but Michelin quickly discovered that the position had been posted in error and was not available. Hill then chose Service Z from the remaining positions.

2. The record is not completely clear about the dates on which some of these events occurred. There is, however, no dispute that Hill was absent from work on Tuesday, April 28, and any uncertainty about the dates of the other events is not material to the issues on appeal.

about his attendance during the prior week, his immediate response was "I worked all week last week." J.A. 210. Hill insisted that he had worked every day the prior week until Snead asked Hill about Putnam's specific question as to whether Hill had taken vacation. Snead testified that Hill then responded that Putnam "should have asked me if I took vacation on Tuesday." J.A. 211. Because the specific day at issue had not been mentioned before, Snead believed that Hill's sudden recollection showed that he knew all along that he had taken a vacation day. Snead asked Hill how he could have forgotten about the vacation day, particularly so soon after their conversation about the rate at which he was using his vacation days. Hill's only explanation was that "his mind got cluttered." J.A. 212. Snead concluded that Hill had intentionally falsified his time card, and she terminated him.

Hill challenged the termination through Michelin's "fair treatment" program and presented his claims to a review board composed of two hourly employees and one salaried employee. During that proceeding, Hill contended that Putnam merely asked him if the time card was correct but did not ask if he had taken any vacation time or specifically question Hill about whether he worked on Tuesday, April 28. Hill claimed that he simply forgot that he had taken a vacation day and that he would have remembered and immediately corrected his time card if Putnam had specifically asked about Tuesday. Hill argued that other Michelin employees who made mistakes on their time cards were not terminated and that Michelin treated him differently because of his Reserve status. The review board ruled in favor of Michelin, concluding that Hill knew about the vacation day when he filled out the time card and that Hill intentionally falsified the time card. The board also concluded that Hill's Reserve status had nothing to do with his dismissal.

Hill then brought this action, contending that Michelin transferred Hill from the Q–Laboratory to Service Z and terminated him because of his Reserve obligations, thus violating USERRA. The district court granted summary judgment to Michelin, concluding that the transfer to Service Z was not actionable under USERRA and that Hill failed to show that his Reserve status was a motivating factor in his discharge.

## II.

USERRA was enacted, in part, "to prohibit discrimination against persons because of their service in the uniformed services." 38 U.S.C.A. § 4301(a)(3). Accordingly, USERRA provides that "[a] person who is a member of ... or has an obligation to perform service in a uniformed service shall not be denied initial employment, reemployment, retention in employment, promotion, or any benefit of employment by an employer on the basis of that membership ... or obligation." 38 U.S.C.A. § 4311(a). USERRA defines "benefit" or "benefit of employment" as

any advantage, profit, privilege, gain, status, account, or interest (other than wages or salary for work performed) that accrues by reason of an employment contract or agreement or an employer policy, plan, or practice and includes ... the opportunity to select work hours or location of employment.

38 U.S.C.A. § 4303(2).

USERRA's predecessor, the Vietnam Era Veterans Readjustment Assistance Act of 1974, was interpreted by the Supreme Court to prohibit only those acts of discrimination that were motivated *solely* by an employee's reserve status. *See Monroe v. Standard Oil Co.*, 452 U.S. 549,

559, 101 S.Ct. 2510, 69 L.Ed.2d 226 (1981). USERRA was enacted in 1994 and significantly broadened the protection afforded those in military service by prohibiting discriminatory actions where the employee's military status is a "motivating factor" in the decision, even if the employee's military status is not the sole factor in the decision. *See* 38 U.S.C.A. § 4311(c)(1); *Sheehan v. Department of the Navy,* 240 F.3d 1009, 1012–13 (Fed.Cir.2001). If the employee establishes that his military status was a motivating factor in the employer's decision, USERRA then shifts the burden of proof to the employer, allowing the employer to avoid liability only if "the employer can prove that the action would have been taken in the absence of" the employee's military status. 38 U.S.C.A. § 4311(c)(1); *see Sheehan,* 240 F.3d at 1013; *Gummo v. Village of Depew, N.Y.,* 75 F.3d 98, 105–06 (2d Cir.1996).

## A. *Transfer*

The district court concluded that Hill's "subjective opinion of the status of his job is insufficient to establish a denial of a benefit of employment," and that "an inconvenient work schedule is different from being denied the ability to choose work hours." J.A. 238. Because there was no evidence that Hill could not choose his work hours in Service Z, the district court concluded that the transfer was not a denial of a benefit of employment under USERRA. And because the transfer did not involve the denial of a "benefit of employment," the district court concluded that whether Michelin transferred Hill because of his Reserve obligations was immaterial and did not prevent the granting of summary judgment in favor of Michelin.

■ Hill argues on appeal that there are substantial differences between the jobs in the Q–Laboratory and Service Z, and that the Service Z position "carried

less status" and was one "that no one else wanted." J.A. 106. Hill contends that the district court erred by concluding that, as a matter of law, the transfer from the Q–Laboratory to Service Z did not constitute a denial of a benefit of employment under USERRA. We agree.

While the transfer from the Q–Laboratory to Service Z apparently carried with it no loss in wages, the record does establish several differences between the Q–Laboratory position and the one in Service Z. For example, the Q–Laboratory provides a clean working environment, and employees are allowed to wear street clothes and are not required to shower at the end of their shifts. Service Z, by contrast, is very dirty, and employees are required to wear coveralls and to shower at the end of their shifts. In fact, work in Service Z is so dirty that employees must use baby oil to remove the carbon from their skin.

The record also establishes a significant difference between the working schedules for those employed in Service Z and the Q Laboratory. The Q–Laboratory operates under an eight-hour/seven-day rotating shift. That is, employees work eight hours a day for seven days on the day shift, then rotate to work eight hours a day for seven days on the evening shift, and then rotate to work eight hours a day for seven days on the night shift, with time off between each rotation. While employees in Service Z also rotate between shifts, they must work both eight-hour and twelve-hour days during each shift rotation.

■ As noted above, USERRA defines "benefit of employment" as "any advantage, profit, privilege, gain, status, account, or interest" arising from an employment contract, including "the opportunity to select work hours or location of employment." 38 U.S.C.A. § 4303(2). Because USERRA was enacted to protect the

rights of veterans and members of the uniformed services, it must be broadly construed in favor of its military beneficiaries. *See Coffy v. Republic Steel Corp.*, 447 U.S. 191, 196, 100 S.Ct. 2100, 65 L.Ed.2d 53 (1980) (noting that predecessor to USERRA "is to be liberally construed for the benefit of the returning veteran"); *McGuire v. United Parcel Serv.*, 152 F.3d 673, 676 (7th Cir.1998) ("USERRA is to be liberally construed in favor of those who served their country."); *Petersen v. Department of Interior*, 71 M.S.P.R. 227, 236 (1996) (observing that USERRA's "benefit of employment" should be expansively interpreted). And, of course, because this case involves the granting of summary judgment, we must view the facts in the light most favorable to the nonmoving party. *See, e.g., Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

We need not decide whether what Hill believes are the more favorable working conditions and environment of the Q Laboratory are benefits of employment under USERRA, because we conclude that the Q–Laboratory's more regular working schedule is, in and of itself, a benefit of employment. While both positions involved rotating shifts, the Service Z position required Hill to work some twelve-hour days during each shift, while he was required to work only eight-hour days in the Q–Laboratory. Just as a first shift job is generally preferred over a third shift job, most workers would also prefer a more regular schedule of shorter work days. Given the broad reach of USERRA and its purpose of protecting the interests of those serving in the uniformed services, we believe that the Q–Laboratory's more regular schedule is properly viewed as an advantage of the job under USERRA's definition of "benefit of employment." *See Allen v. United States Postal Serv.*, 142 F.3d 1444, 1447 (Fed.Cir.1998) (concluding

that a position's "desirable" schedule with regular daytime hours "is an 'incident or advantage of employment' "); *Carlson v. New Hampshire Dep't of Safety*, 609 F.2d 1024, 1026–27 (1st Cir.1979) (finding violation of predecessor to USERRA in case where the plaintiff, who previously worked 8:00 a.m. to 5:00 p.m. four days a week and 1:00 p.m. to 10:00 p.m. one day a week, but never on weekends, was transferred to a unit working rotating 9 hour shifts that included weekends, even though plaintiff lost no salary, seniority, or other benefits). Thus, by transferring Hill from the Q–Laboratory to Service Z and requiring him to work a less regular schedule with longer work days, Michelin denied Hill a benefit of employment.

■ As the district court noted, the parties strongly disagree about why Hill was transferred—Hill contends Michelin transferred him against his will because of his Reserve obligations, while Michelin contends that Hill asked to be transferred despite Michelin's assurances that the Q–Laboratory could accommodate Hill's Reserve obligations. Because the transfer to Service Z must be viewed as a denial of a benefit of employment and because there is a question of fact as to whether Hill's Reserve status was a motivating factor in the transfer, the grant of summary judgment to Michelin on this claim must be reversed. *See, e.g., Jakubiak v. Perry*, 101 F.3d 23, 26 (4th Cir.1996) ("Summary judgment is proper only if no material facts are in dispute.").

### B. *Termination*

The district court also granted summary judgment to Michelin on Hill's termination claim, concluding that Hill failed to present any evidence tending to show that his Reserve status was a motivating factor in Michelin's decision to terminate him. The

district court first concluded that no inference of an improper motive could be drawn from the fact that Hill had taken a longer-than-usual Reserve leave the weekend before he was fired. The district court noted that Hill had been taking Reserve leave for several years without incident and that Hill claimed he was fired because of his Reserve status in general, not because he requested an unusually long period of leave. The district court also concluded that Hill's evidence of statements made by various Michelin employees expressing some hostility towards Hill and his Reserve obligations lacked probative value because the statements were not made by Lisa Snead, the Michelin employee who made the decision to terminate Hill.

On appeal, Hill contends that the district court erred by concluding that he failed to present evidence from which a reasonable factfinder could conclude that Hill's reserve status was a motivating factor in Michelin's decision to terminate him. Hill contends that an inference of improper motive can be drawn from the temporal proximity of the termination to the improper transfer to Service Z. Hill also argues that the district court's discounting the evidence of the anti-Reserve statements was an application of what Hill describes as the "stray remarks" doctrine. *See, e.g., Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 608 (4th Cir.1999) ("[T]o prove discriminatory animus, the derogatory remark cannot be stray or isolated and unless the remarks upon which plaintiff relies were related to the employment decision in question, they cannot be evidence of discrimination." (internal quotation marks and alterations omitted)). According to Hill, the Supreme Court repudiated the doctrine in *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), and the district court therefore erred by disregarding the statements.

■ We need not address these arguments, however, because we assume that Hill's evidence was sufficient, for summary judgment purposes, to carry his burden of establishing that Hill's Reserve status was a motivating factor in his termination. *See Sheehan*, 240 F.3d at 1014 ("Discriminatory motivation under the USERRA may be reasonably inferred from a variety of factors, including proximity in time between the employee's military activity and the adverse employment action, ... [and] an employer's expressed hostility towards members protected by the statute together with knowledge of the employee's military activity....").

Although Michelin's primary argument is that Hill failed to establish that his termination was motivated in any respect by his Reserve status, Michelin also argues that the evidence it presented to the district court clearly established that it would have fired Hill for the time card incident even in the absence of any improper motive. *See* 38 U.S.C.A. § 4311(c)(1). We agree.

Michelin presented evidence establishing that it terminates all employees who intentionally falsify time cards. Michelin gave Hill more than one opportunity to explain the discrepancy in his time card, which he failed to do. Once Michelin determined that Hill intentionally falsified his time card, it fired him for that offense, as it had done with all other similarly situated employees. This evidence, if unchallenged, would be sufficient to carry Michelin's burden of proving that it would have fired Hill regardless of his Reserve status. *See Robinson v. Morris Moore Chevrolet–Buick, Inc.*, 974 F.Supp. 571, 578 (E.D.Tex.1997) (explaining that an employer whose employment decision was motivated in part by an employee's military status is entitled to summary judgment if the employer can

prove that the permissible reason for its employment decision, "standing alone, would have induced it to make the same decision").

The evidence presented by Hill falls short of creating any genuine issues of material fact as to this question. To be sure, there is evidence in the record establishing that Michelin does not fire all employees who make mistakes on their time cards, and Hill's position below was that he simply made a mistake that he would have corrected if Michelin had specifically asked him if he had taken a vacation day on Tuesday, April 28. Hill, however, did not present any evidence from which it could be inferred that Michelin does not terminate all employees who are determined to have intentionally falsified their time cards, nor did he present any evidence from which it could be inferred that Michelin did not really believe that Hill's failure to note the vacation day was intentional.

Thus, there is no dispute that Michelin gave Hill an opportunity to correct his time card and that Hill failed to correct the card. And there is likewise no dispute that Michelin determined that Hill's actions were intentional, a decision also reached by the Michelin's employee-conducted fair treatment review. Hill's complaints about the way the investigation was conducted and the result of the investiga-

tion are insufficient to create a genuine issue of material fact as to the relevant questions—whether Michelin determined that Hill's actions were intentional and whether Michelin consistently terminates employees who intentionally falsify their time cards.[3] *Cf. DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir.1998) ("[W]hen an employer articulates a reason for discharging the plaintiff not forbidden by law, it is not our province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination."); *Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 960–61 (4th Cir. 1996) ("It is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff." (internal quotation marks omitted)).

■ All of the evidence in the record establishes that Michelin fires all employees who intentionally falsify time cards and that Michelin terminated Hill because it determined, after an investigation, that Hill intentionally falsified his time card. We therefore conclude that Michelin carried its burden of proving that it would have fired Hill because of the time card incident without regard to Hill's Reserve status.[4]

Summary judgment, therefore, was properly granted to Michelin on Hill's ter-

---

**3.** In his deposition, Hill offered vague testimony about an employee who falsified a time card but was not fired. Hill's testimony, however, did not indicate whether Michelin investigated the incident and determined that the error was not intentional. This vague evidence is therefore insufficient to create a genuine issue of material fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256–57, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (explaining that to withstand a motion for summary judgment, a plaintiff must adduce some concrete evidence on which a reasonable juror could return a verdict in his favor); *see also Goldberg v. B. Green & Co.*, 836 F.2d 845, 848 (4th Cir.1988).

**4.** Hill suggested at oral argument that if not for the improper transfer to Service Z, he would not have been in a position to make a mistake on the time card, presumably because he was not required to use time cards in the Q-Laboratory. If the transfer is ultimately determined to violate USERRA, we do not believe that USERRA then gives Hill blanket immunity for his actions in Service Z. USERRA does not prohibit Michelin from handling the time card incident in its usual manner, even if the incident could not have happened without the improper transfer. *See Gummo*, 75 F.3d at 106 (noting that an employer can "escape liability [under USERRA] by showing, as an affirmative defense, that it would

mination claim. *See, e.g., Brewster of Lynchburg, Inc. v. Dial Corp.*, 33 F.3d 355, 361 n. 3 (4th Cir.1994) ("We have consistently recognized that, even though we disagree with the reasoning of the district court, we may affirm the result on different grounds if fully supported by the record.").

## III.

■ To summarize, we conclude that the transfer from the Q–Laboratory to Service Z must be considered a denial of a benefit of employment under USERRA. And because there is a question of fact about whether the transfer was motivated by Hill's Reserve status, we reverse the district court's grant of summary judgment in favor of Michelin on Hill's transfer claim and remand for further proceedings. However, we conclude that the district court properly granted summary judgment to Michelin on Hill's termination claim. Accordingly, the decision of the district court is hereby affirmed in part, reversed in part, and remanded for further proceedings on Hill's claim that his transfer to Service Z violated USERRA.[5]

*AFFIRMED IN PART, REVERSED IN PART, AND REMANDED FOR FURTHER PROCEEDINGS.*

---

have made the same decision without regard to the employee's protected status").

5. The termination occurred only a few working days after the transfer, and there is no indication in the record that Hill lost any wages or benefits by virtue of the transfer. Therefore, even if Hill can prove that the transfer was motivated by his Reserve status, it appears that he will not be able to establish that he suffered any monetary damages because of the transfer. *See* 38 U.S.C.A. § 4323(d)(1)(B). We note, however, that USERRA authorizes the district court to "require

the employer to comply with the provisions of this chapter," 38 U.S.C.A. § 4323(d)(1)(A), and to "use its full equity powers ... to vindicate fully the rights or benefits of persons under this chapter," 38 U.S.C.A. § 4323(e). USERRA also provides for an award of attorney's fees and costs to a prevailing plaintiff. *See* 38 U.S.C.A. § 4323(h)(2). Thus, while compensatory damages might be unavailable to Hill on remand, we cannot say that there is no relief to which he is entitled.