In the

# United States Court of Appeals

### For the Seventh Circuit

No. 08-2435

RYAN P. CREWS,

*Plaintiff-Appellant,*

*v.*

CITY OF MT. VERNON, a municipal corporation,
CHRISTOPHER DEICHMAN, individually and in his
capacity as Assistant Chief of Police for the City of
Mt. Vernon, and CHRIS MENDENALL, individually and in
his capacity as Chief of Police for the City of Mt. Vernon,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Southern District of Illinois.
No. 3:06-cv-1012-DRH-DGW—**David R. Herndon**, *Chief Judge.*

ARGUED DECEMBER 11, 2008—DECIDED JUNE 2, 2009

Before MANION, EVANS, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* For nine years, the City of
Mt. Vernon allowed police officers who missed their
weekend work shifts to attend National Guard duties to
make up the time on their scheduled days off. The City

provided no comparable scheduling benefit to non-Guard employees who missed work for other, non-military activities. This appeal presents the question of whether, under the Uniformed Services Employment and Reemployment Act ("USERRA"), 38 U.S.C. §§ 4301-35, the City must continue to provide these work scheduling preferences to Guard employees, even though nothing in the Act would have required the City to establish the preferences in the first place. We hold that USERRA does not require such preferential treatment and accordingly affirm the district court's grant of summary judgment in favor of the defendants.

## I. Background

Ryan Crews has been a member of the Army National Guard since 1988 and an officer of the Mt. Vernon Police Department since 1997. As a member of the Guard, Crews must attend weekend training and preparedness exercises, or "drill," about once a month. As a "patrol officer" for the Department from 1997 to 2006 and a "corporal officer" since 2006, Crews's weekly work schedule is governed by the Collective Bargaining Agreement ("CBA") between the City and police employees. Under the CBA, the City has discretion to establish employees' work schedules to meet operational needs, although the City must make a "good faith effort" to honor employees' requests for their preferred days off. In practice, Chief of Police Chris Mendenall, a defendant in this action, has the authority to establish officers' weekly work schedules, which consist of five, eight-hour shifts and two days off.

Crews's weekend drill obligations frequently conflict with his Department work schedule. When such a conflict arises, the City grants Crews and other Guard employees military leave to attend drill. Although this leave is unpaid, Guard employees may turn in their military pay for attending drill in exchange for their regular City pay so as not to incur any net loss in weekly compensation. Guard employees may also allocate their accrued vacation days, personal days, and compensatory time off to days missed for drill, thereby collecting City pay *and* military pay for time spent at drill.

In addition to providing military leave and supplemental City pay, the Department maintained a policy for several years that allowed Guard employees to reschedule work shifts that fell on drill weekends. In a 1997 memorandum, Crews's supervisor told Crews that he could "use the monthly weekend drills as [his] days off for that week with no loss of pay." By allowing Crews to move his weekend shifts missed for drill to his scheduled days off during the regular work week, the Department's policy enabled Crews to collect, in addition to his military pay for attending drill, a full week's pay from the City. The Department extended this work scheduling benefit to three other Guard members who joined the Department between 2000 and 2003. Non-Guard employees did not have a comparable opportunity to reschedule work shifts missed for outside, non-Departmental activities.

In August 2006, after the Department had hired two additional Guard members, Mendenall rescinded the

work scheduling policy. Mendenall and Assistant Chief of Police Chris Deichman, also a defendant in this action, determined that extending the policy to an increasing number of Guard employees would result in too many, costly scheduling conflicts. By allowing Guard employees to reschedule their weekend shifts missed for drill, the policy required the City to pay these employees to work shifts during the regular work week that were already fully staffed. While that overstaffing problem was manageable when the Department originally extended the policy to only Crews, the cost of maintaining the policy for all current and future Guard employees was increasing.

Following the rescission of the scheduling policy, Crews tried to persuade Deichman to continue allowing him to reschedule his work days missed for drill, but Deichman refused and told Crews to bring any further complaints to Chief Mendenall. Crews thereafter limited his conversations with Deichman to official business, prompting Deichman to note Crews's negative demeanor on his September 2006 quarterly evaluation. Deichman also denied Crews's requests to attend classes to become a field training officer ("FTO"), explaining that he did not approve FTO training for officers of a corporal or higher rank because they spend too little time in the field.

Since the rescission of the work scheduling policy, Crews is no longer able to collect a full week's pay from the City when he misses a weekend shift for drill, unless he uses up his limited days of paid time off. Further, the impact of losing the policy's scheduling benefits is more

acute for Crews now that he is a corporal. Per a 1998 decision by Mendenall, corporals do not bid for their preferred days off like lower-ranking officers, but rather have regular Wednesday-Sunday work schedules. (The purpose of requiring corporals to regularly work weekends is to ensure that every shift has a sufficient number of high-ranking officers; the more senior captains enjoy regular days off on Saturdays and Sundays, leaving the corporals and sergeants to provide leadership during the less desirable weekend shifts.) So while he remains a corporal, Crews's weekend drill obligations will regularly conflict with his scheduled work days.

In December 2006, Crews filed a complaint against the City of Mt. Vernon, Mendenall, and Deichman, alleging that the rescission of the work scheduling policy denied him a benefit of employment based on military status, in violation of USERRA, 38 U.S.C. § 4311. Crews also claimed that Deichman retaliated against him for opposing the rescission of the policy by making negative comments toward Crews and denying him advancement opportunities.

The district court concluded that § 4316(b)(1) of USERRA governed Crews's claim. That section provides that "a person who is absent from a position of employment by reason of service in the uniformed services" is "deemed to be on furlough or leave of absence" and entitled to such benefits "as are *generally* provided by the employer" to non-military employees who take a comparable leave of absence. 38 U.S.C. § 4316(b)(1) (emphasis added). The court concluded that, under § 4316(b), the City was not

required to give Crews preferential work scheduling benefits not generally available to non-Guard employees. The court also rejected Crews's retaliation claim, concluding that denying Crews the opportunity to attend FTO classes, making negative comments, and noting his negative attitude on a quarterly evaluation were not "materially adverse" employment actions. The court accordingly denied Crews's motion for summary judgment and granted the City's motion for summary judgment. Crews timely appealed.

## II. Discussion

We review de novo the district court's grant of summary judgment. *Cavin v. Home Loan Ctr., Inc.*, 531 F.3d 526, 528 (7th Cir. 2008) (citation omitted). Where, as here, "the parties have filed cross-motions for summary judgment, we construe the evidence and all reasonable inferences in favor of the party against whom the motion under consideration is made." *Id.* (quotation omitted).

Enacted in 1994, USERRA is the latest in a series of veterans' employment rights laws, replacing its most immediate predecessor, the Veterans' Reemployment Rights Act ("VRRA") of 1974. 20 C.F.R. § 1002.2. The purposes of USERRA are: "(1) to encourage noncareer service in the uniformed services . . . ; (2) to minimize the disruption to the lives of persons performing service in the uniformed services . . . by providing for the prompt reemployment of such persons upon their completion of such service; and (3) to prohibit discrimination against persons because of their service in the uniformed

services." 38 U.S.C. § 4301(a). "In enacting USERRA, Congress emphasized USERRA's continuity with the VRRA . . . and that the large body of case law that had developed under [earlier] statutes remained in full force and effect, to the extent it is consistent with USERRA." 20 C.F.R. § 1002.2.

USERRA affords broad protections to service members against employment discrimination, providing that members "shall not be denied initial employment, reemployment, retention in employment, promotion, or any benefit of employment by an employer on the basis of that membership . . . ." 38 U.S.C. 4311(a). A "benefit of employment" means "any advantage, profit, privilege, gain, status, account, or interest (other than wages or salary for work performed) that accrues by reason of an employment contract or agreement or an employer policy, plan, or practice and includes . . . the opportunity to select work hours or location of employment." *Id.* § 4303(2). Under the burden-shifting framework of § 4311, a plaintiff makes out a prima facie case of discrimination by showing that his service membership was "a motivating factor in the employer's action." *Id.* § 4311(c)(1). The employer must then "prove that the action would have been taken in the absence of such membership." *Id.*

Apart from the general anti-discrimination provision of § 4311, § 4316 establishes the rights of service members who are absent from employment while fulfilling their service obligations. Such members are "(A) deemed to be on furlough or leave of absence while performing such service; and (B) entitled to such other rights and

benefits not determined by seniority as are generally provided by the employer" to similarly situated employees who take a leave of absence comparable to the military leave. *Id.* § 4316(b)(1).

## A.  Denial of a "Benefit of Employment"

In determining whether the Department's rescission of the work scheduling policy denied Crews and other Guard employees a "benefit of employment" in violation of USERRA, we must first determine the applicable provision(s) of the Act. If Crews's claim is governed exclusively by § 4316(b)(1), which requires only equal benefits for Guard and non-Guard employees, then Crews clearly has no right to special scheduling flexibility. If § 4316(b)(1) is not the only applicable USERRA provision, then Crews may have a viable § 4311 claim.

The Fifth Circuit has examined the interplay between §§ 4311 and 4316 and concluded that the latter section applied to reservist employees who, like Crews, claimed a right to special employment benefits while absent for drill. In *Rogers v. City of San Antonio*, 392 F.3d 758, 760-61 (5th Cir. 2004), firefighters challenged the City's refusal to give them pay, accrual of vacation leave, and other attendance-based benefits during their absences to attend drill. After engaging in a comprehensive analysis of USERRA's legislative history, the court concluded that § 4316(b)(1), rather than § 4311(a), applied to the reservists' claims. *Id.* at 764-70. Further, because § 4316(b)(1) requires only "equal, but not preferential" treatment for reservist employees, the firefighters were not entitled to benefits

not available to non-reservist employees who took comparable leaves of absence. *Id.* at 769.

We agree with the Fifth Circuit's analysis in *Rogers* and conclude that § 4316(b)(1) will ordinarily prevent Guard employees who miss work for drill from demanding employment benefits (other than those determined by seniority) that are not generally available to non-Guard employees who miss work for other reasons. That conclusion is consistent with *Monroe v. Standard Oil Co.*, 452 U.S. 549, 561 (1981), in which the Supreme Court held that USERRA's predecessor statute did not require an employer "to provide a special work-scheduling preference" to a reservist who, like Crews, wanted to reschedule his work days missed for reserve training in order to collect a full week's pay. Seventh Circuit precedent also supports *Rogers*'s interpretation of § 4316(b)(1), as we have held that Guard members are not entitled to preferential policies that allow them to resolve conflicts between work schedules and Guard training. *See Pignato v. Am. Trans Air, Inc.*, 14 F.3d 342, 349-350 (7th Cir. 1994). Although this case law predates USERRA, it still remains "in full force and effect, to the extent it is consistent with USERRA." 20 C.F.R. § 1002.2; *see also Rogers*, 392 F.3d at 768 (concluding that Congress intended § 4316(b)(1) to codify *Monroe*'s "equal, but not preferential" rule).

While we agree with the Fifth Circuit's analysis, it would be premature to conclude that only § 4316(b)(1) governs this case and that *Rogers* forecloses Crews's USERRA claim. The remedies provided by §§ 4311 and 4316 are not necessarily mutually exclusive, and factual distinctions

between *Rogers* and this case require us to examine whether Crews has a viable claim under § 4311. The reservists in *Rogers* were not complaining about the withdrawal of pre-existing employment benefits; in contrast, Crews argues that the City violated § 4311 by rescinding an existing policy of providing Guard employees with special work scheduling benefits. According to Crews, while USERRA may not have required the City to establish that policy in the first place, having voluntarily done so, the City cannot now renege.

Crews's interpretation of § 4311 admittedly finds some support in the statutory language of USERRA. Section 4311(a) prohibits the denial of "*any* benefit of employment . . . on the basis of" membership in the uniformed services. 38 U.S.C. § 4311(a) (emphasis added). Nothing in the text of either § 4311(a) or § 4303(2), which defines "benefit of employment," indicates that § 4311 covers only those benefits extended generally to military and non-military employees alike. Nonetheless, the better interpretation is that the "benefit of employment" referenced in § 4311(a) is one provided to both military and non-military employees. Section 4311 is entitled "Discrimination against persons who serve in the uniformed services and acts of reprisal prohibited." Accordingly, courts have indicated that the statute reaches only discriminatory employment actions that provide military employees with fewer benefits. *See Sandoval v. City of Chicago*, 560 F.3d 703, 704 (7th Cir. 2009) ("[Section] 4311 is an anti-discrimination rule."); *Miller v. City of Indianapolis*, 281 F.3d 648, 650 (7th Cir. 2002) ("USERRA prohibits discrimination by, among other things, denying any benefit of

employment on the basis of the employee's membership in the uniformed services."); *Velazquez-Garcia v. Horizon Lines of Puerto Rico, Inc.*, 473 F.3d 11, 15-16 (1st Cir. 2007) (citing § 4311(a), (c) as "the mechanism of proving discrimination claims under USERRA"); *Rogers*, 392 F.3d at 762 (describing § 4311(a) as "USERRA's anti-discrimination provision"); *Hill v. Michelin N.A., Inc.*, 252 F.3d 307, 311 (4th Cir. 2001) (citing § 4311(a) as the provision that effectuates USERRA's purpose "to prohibit discrimination against persons because of their service in the uniformed services" (quoting 38 U.S.C. § 4301(a)(3))). In addition, the legislative history of § 4311(a) provides that the statute "would reenact the current prohibition against discrimination" on the basis of service membership. H.R. Rep. No. 103-65(I), at 23 (1993), *reprinted in* 1994 U.S.C.C.A.N. 2449, 2456; *see also Rogers*, 392 F.3d at 768 ("[T]he brief legislative history of the bill that became § 4311(a) reflects no intention to prohibit neutral labor contracts from treating employees on military leave equally with those on non-military leave with respect to the loss of benefits due to absence from work.").

Given the anti-discriminatory purpose of § 4311, the Department's decision in this case to provide equal work scheduling benefits to all employees does not violate USERRA. The preferential work scheduling policy that the Department previously extended to Guard employees was not a "benefit of employment" within the meaning of § 4311(a), as this benefit was not one generally available to all employees. It follows that the Department's rescission of that policy could not be a "denial" of any "benefit of employment" actionable under § 4311(a).

Crews argues that grafting a discrimination require-ment onto § 4311 fails to appreciate the breadth of USERRA's protections. While one purpose of USERRA is to prohibit employment discrimination on the basis of military status, the Act also serves "to encourage noncareer service in the uniformed services . . . ." 38 U.S.C. § 4301(a)(1). Crews notes that this goal of encouraging military service distinguishes USERRA from other civil rights laws, which serve not to encourage membership in the protected class but simply to prevent discrimina-tion on the basis of that membership.

While Crews raises a valid point that USERRA does more than prevent discrimination, our holding that Crews's particular § 4311 claim requires a showing of discrimina-tory treatment does not undermine the broader purposes of the Act. Through a number of provisions other than § 4311, USERRA encourages military service by granting service members rights with respect to civilian employ-ment that are not available to similarly situated, non-military employees. *See* 38 U.S.C. § 4312 (entitling a service member who leaves civilian employment for military service to reemployment upon return); *id.* § 4316(a) (granting a reemployed service member the same seniority benefits that would have accrued had the member "remained continuously employed"); *id.* § 4317 (providing that an employee absent for military service may elect to continue coverage under the employer's health plan); *id.* § 4318 (requiring employers to count time in military service toward employees' pension benefits). Crews does not claim that the Department denied him any of these rights. Instead, he tries to charac-

terize his claim for additional work scheduling preferences not required by USERRA in terms of a denial of a "benefit of employment" under § 4311(a), which he cannot do absent a showing of discriminatory treatment.

USERRA also encourages military service by authorizing employers to go above and beyond the minimum requirements of the statute. According to a Department of Labor ("DOL") regulation interpreting the Act, "USERRA establishes a floor, not a ceiling, for the employment and reemployment rights and benefits of those it protects," such that "an employer may provide greater rights and benefits than USERRA requires." 20 C.F.R. § 1002.7(a). Nothing about our holding suggests that employers should not continue to provide greater benefits as they are able, much like the Department in this case did for several years by giving Guard employees work scheduling preferences. The Department's recent decision to revoke those preferences and return to the "floor" requirements, while understandably disappointing to Crews, does not violate USERRA. We add that, if Guard employees like Crews want legal protection against their employer's discretion to unilaterally revoke special benefits, they can negotiate to make those benefits part of a "contract" or "agreement." *Id.* § 1002.7(c). Here, however, the Department's work scheduling policy for Guard employees was strictly voluntary, and Crews has not claimed that any contract or other provision of law required the defendants to maintain the policy. *Cf. Miller*, 281 F.3d at 651-52 (observing that, while the City's method of deducting days of paid military leave for time spent at reserve training did not violate USERRA, it may have

violated the state statute granting that leave); *Butterbaugh v. Dep't of Justice*, 336 F.3d 1332, 1337-38 (Fed. Cir. 2003) (concluding that an agency employer incorrectly applied the non-USERRA federal statute granting military leave by requiring employees to take leave for training that fell on non-work days).

In the interest of completeness, we conclude our discussion of Crews's denial-of-benefit claim by addressing his challenges to certain characterizations of fact made by the district court and the defendants. Crews objects to the district court's finding that the Department's current work scheduling policy treats Guard and non-Guard employees equally in that no employee can reschedule days off to coincide with outside activities. The relevance of Crews's objection is unclear, since Crews does not base his USERRA claim on unequal treatment. Instead, Crews argues that he is entitled, consistent with past Departmental policy, to more favorable work scheduling benefits than those available to non-Guard employees. In any event, the undisputed deposition testimony indicates that Guard and non-Guard employees have equal work scheduling opportunities. Both Deichman and Crews himself testified that all officers cannot switch their scheduled work days and days off unless they trade shifts with a consenting coworker. To the extent that Crews is trying to make out a separate § 4311 discrimination claim based on unequal treatment, he has not carried his burden of producing contradictory evidence that non-Guard employees have greater work scheduling benefits. *See Velazquez-Garcia*, 473 F.3d at 17 (describing the employee's initial burden of showing that military status was "at

least a motivating or substantial factor" in an employer's adverse action); *Schmauch v. Honda of Am. Mfg., Inc.*, 295 F. Supp. 2d 823, 837 (S.D. Ohio 2003) ("To show a violation of § 4311(a), Plaintiff must establish that he was denied a 'benefit of employment.' ").

Crews also takes issue with the defendants' representation that, as a corporal, Crews has "fixed" days off on Mondays and Tuesdays, such that he cannot bid for his preferred days off like lower-ranking patrol officers. Corporals' days off are "fixed," Crews retorts, only by virtue of Chief Mendenall's discretionary decision requiring corporals to work weekends. Crews further points out that Mendenall's decision is inconsistent with the CBA, which provides that all police employees, including "corporal officers," may request their preferred days off before the Department posts work schedules.

Again, the relevance of this factual representation is questionable, since Crews's USERRA claim relies on the theory that he is entitled to preferential scheduling benefits irrespective of when corporals usually work. Had Crews argued that the Department treated him unequally by requiring him to work weekends, and that the defendants' reliance on the corporal's work schedule was a mere "pretext" for military animus, *see Velazquez-Garcia*, 473 F.3d at 16, then whether corporals' days off are indeed "fixed" as the defendants suggest would be critical to Crews's § 4311 discrimination claim. But Crews has not presented such a theory of discrimination.

Moreover, the record supports the conclusion that corporals have regular Wednesday-Sunday work sched-

ules. Both Mendenall and Tom Vowell, a Department captain, testified that Mendenall decided in 1998 that corporals' regular days off would be Mondays and Tuesdays. Crews also acknowledged that, when he accepted the promotion to corporal, he knew that he would have Mondays and Tuesdays off. So corporals' Wednesday-Sunday work schedule, while not mandated by the CBA, was sufficiently well-established as a matter of Departmental policy to give Crews notice that accepting the corporal position would reduce his scheduling flexibility. As for the CBA's provision that corporals may bid for their preferred days off, to the extent that Crews is arguing that Mendenall's 1998 decision violates that provision, Crews's argument is, at best, more suited for internal grievance procedures or even a separate, non-USERRA legal action.

## B.  Retaliation Under USERRA

We turn to Crews's claim that the defendants retaliated against him for voicing his opposition to the rescission of the work scheduling policy. In addition to protecting against discrimination on the basis of service membership, § 4311 prohibits an employer from taking "any adverse employment action against any person because such person . . . has taken an action to enforce a protection" provided by USERRA. 38 U.S.C. § 4311(b)(1). Although we have not previously discussed the statute's "adverse employment action" requirement in the specific context of a USERRA retaliation claim, our case law on other civil rights statutes describes those employment

actions that are sufficiently "adverse" to be actionable retaliation. "An adverse employment action must be materially adverse, not merely an inconvenience or a change in job responsibilities." *Griffin v. Potter*, 356 F.3d 824, 829 (7th Cir. 2004). "An adverse employment action is one that significantly alters the terms and conditions of the employee's job." *Id.* Materially adverse actions include termination, demotion accompanied by a decrease in pay, or a material loss of benefits or responsibilities, but do not include "everything that makes an employee unhappy." *Lapka v. Chertoff*, 517 F.3d 974, 986 (7th Cir. 2008) (quotation omitted). There is no reason to understand "adverse employment action" differently in the USERRA context.

Echoing an argument made in support of his denial-of-benefit claim, Crews argues that applying the "materially adverse" standard from other civil rights statutes to his USERRA retaliation claim fails to appreciate the different purposes of USERRA and conventional civil rights laws. However, we have previously stated in a USERRA case that actionable discrimination must involve a "materially adverse employment action," which is "something more disruptive than a mere inconvenience or an alteration of job responsibilities." *Maher v. City of Chicago*, 547 F.3d 817, 824 (7th Cir. 2008) (quoting *Nichols v. S. Ill. Univ.—Edwardsville*, 510 F.3d 772, 780 (7th Cir. 2007)). Although *Maher* involved a claim of discrimination, we see no reason to dispense with the materiality requirement in retaliation cases. Requiring material adversity for both types of claims is consistent with the Supreme Court's decision in *Burlington Northern & Santa Fe Railway*

*Co. v. White*, 548 U.S. 53 (2006), in which the Court established the standard for retaliation claims under Title VII. The Court concluded that, although the retaliatory actions prohibited by Title VII are not limited to harms that are employment-related or that occur in the workplace, the action must nonetheless be "materially adverse," such that it "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68 (quotation omitted). Requiring "*material* adversity" is important, the Court continued, to discourage civil rights litigation over "trivial harms." *Id.*

In line with *Burlington*, we do not think that the protections of USERRA are so sweeping as to provide a remedy for mere "trivial harms." That is especially true since textual differences between the anti-retaliation provisions of Title VII and USERRA suggest that the latter has a more limited scope. In concluding that the retaliatory actions prohibited by Title VII are not confined to employment-related harms, the Court in *Burlington* compared the language of Title VII's anti-discrimination provision with the language of the anti-retaliation provision. *Id.* at 62. Unlike the conduct prohibited by the anti-discrimination provision, which must affect an employee's conditions of "employment," the conduct reached by the anti-retaliation provision is not qualified in terms of employment. *Id.* (citing 42 U.S.C. §§ 2000e-2(a), e-3(a)). No comparable textual distinction exists between USERRA's anti-discrimination provision, 38 U.S.C. § 4311(a), and the anti-retaliation provision, *id.* § 4311(b), both of which address only actions affecting "employment."

Applying the "materially adverse" standard to Crews's claim, it is clear that Crews suffered no actionable retaliation. Crews first points to disparaging comments that Chief Mendenall made to the press about Crews's USERRA lawsuit. However, negative employer comments will support a retaliation claim only if they are "severe and pervasive." *Griffin*, 356 F.3d at 829. The plaintiff must show more than "petty slights or minor annoyances that often take place at work and that all employees experience." *Burlington*, 548 U.S. at 68.

Here, the purportedly "disparaging" comments cited by Crews are nothing more than Mendenall's statements to the media that Crews's USERRA lawsuit "had no merit" and that his allegations were "simply untrue." These isolated comments, which occurred outside the workplace and had no impact on Crews's conditions of employment, are not severe enough to be actionable retaliation. *See Breneisen v. Motorola, Inc.*, 512 F.3d 972, 981-82 (7th Cir. 2008) (concluding that a supervisor's comments that expressed frustration with employees' taking medical leave, but that resulted in no loss of job benefits, were not materially adverse); *Griffin*, 356 F.3d at 829-30 (finding that a supervisor's comments at staff meetings that the plaintiff was a "bad influence" and know-it-all were not actionable retaliation); *cf. Smart v. Ball State Univ.*, 89 F.3d 437, 442 (7th Cir. 1996) (concluding that negative employer evaluations, even if undeserved, were not alone sufficient to show an adverse employment action).

Crews also contends that the defendants engaged in retaliation by refusing to allow him to attend FTO classes

following his promotion to corporal, thereby denying him advancement opportunities. However, the record establishes that the Department did not approve FTO classes for corporals and higher-ranking officers. Deichman testified that the job of a corporal, which involves much time in the office handling administrative matters and little time in the actual field, does not lend itself to providing field training to new recruits. Crews also acknowledged that he was unaware of Deichman ever approving FTO training for corporals.

The undisputed evidence also indicates that Crews received alternative, non-FTO training commensurate with his corporal rank. Crews testified that he attended classes in "first line leader management" and "critical incident management," instruction geared toward officers who fulfill a more supervisory role. A log prepared by Deichman also indicated that Crews had completed the third-highest amount of command staff training hours for the period between May 2005 and December 2006—a significant accomplishment, since Crews, having been promoted to corporal in May 2006, was only a command officer for about a third of that period. The Department did not deny Crews training opportunities, and we do not see how changing the specific classes offered based on the officer's rank would dissuade a "reasonable employee" from asserting his USERRA rights. *Burlington*, 548 U.S. at 68. Accordingly, Crews has failed to establish a materially adverse employment action, and the district court properly granted summary judgment for the defendants on Crews's retaliation claim.

### III.  Conclusion

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment in favor of the defendants.